## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

John Joseph Waters, Jr.,

Civil Action No. 12-648 RHK/LIB

Plaintiff,

vs.

**COMPLAINT**

Gerard Leon Cafesjian
G.L.C. Enterprises, Inc., and
The Cafesjian Family Foundation, Inc.

Defendants.

John Joseph Waters, Jr. ("Waters"), for his complaint against Gerard Leon Cafesjian ("Cafesjian"), G.L.C. Enterprises, Inc. ("GLC Enterprises"), and the Cafesjian Family Foundation, Inc. ("CFF"), alleges and states as follows:

### PARTIES

1.      The Plaintiff, John Joseph Waters, Jr., is a citizen of the State of Minnesota.

2.      Gerard Leon Cafesjian is a citizen of the State of Florida, whose principal address is 4351 Gulf Shore Boulevard North, Penthouse 5, Naples, Florida 34103.

3.      G.L.C. Enterprises, Inc. is a Florida corporation formed on August 19, 1996, with its present principal place of business at 10915 Enterprise Avenue, Bonita Springs, Florida 34135-6864. Since 1998, GLC Enterprises has maintained its primary management, operating and accounting office at 15 South Fifth Street, Suite 900, Minneapolis, MN 55402.

SCANNED
MAR 1 3 2012
U.S. DISTRICT COURT MPLS

4.      The Cafesjian Family Foundation, Inc. ("CFF") is a Florida corporation formed on December 27, 1996, with its present principal place of business at 10915 Enterprise Avenue, Bonita Springs, Florida 34135-6864.   Since 1998, the CFF has maintained its primary management, operating and accounting office at 15 South Fifth Street, Suite 900, Minneapolis, MN  55402.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332: citizenship is diverse; and the amount in controversy exceeds $75,000.

## FACTUAL BACKGROUND

### Employment With West

6.      On information and belief, from approximately 1952 until his retirement in 1996, Cafesjian was employed by West Publishing or one of its subsidiaries and/or affiliates ("West").

7.      During his employment at West, Cafesjian held a number of positions and titles, ultimately rising to the position of Executive Vice President.  In his position as Executive Vice President, Cafesjian was responsible for, among other things, the sales and marketing functions of West.

8.      During his term of employment, Cafesjian also became a significant shareholder of West.

9.      Cafesjian, as both an employee and shareholder of West, received significant income from West in the form of wages, benefits and dividends.

2

10.     Cafesjian and Waters first met in 1992.

11.     In 1994 Cafesjian was instrumental in having West employ Waters.

12.     Waters was employed by West from September 1994 through September 1996. While employed at West, Waters worked in the sales and marketing area, directly and indirectly under Cafesjian's direction.

13.     During the term of Waters employment by West, Cafesjian and Waters became better acquainted. Cafesjian often requested and received research, analysis and advice from Waters on the legal and professional publishing industry,

14.     While Cafesjian and Waters were both employed by West, Cafesjian also requested and received from Waters economic and business advice with respect to investment matters unrelated to Cafesjian's affairs at West or to Waters employment with West. Cafesjian sought Waters' advice for Cafesjian's personal benefit.

15.     West was sold to the Thomson Corporation (now Thomson Reuters Corporation) in June of 1996 for approximately $3.42 Billion (the "Sale").

16.     Waters was instrumental in providing significant input and economic data to West and to Cafesjian in connection with the Sale.

17.     As a result of the Sale, Cafesjian received approximately Three Hundred Million Dollars ($300,000,000.00) for his shareholder interest in West (the "Cafesjian Proceeds").

18.     On information and belief, prior to the Sale Cafesjian had also accumulated significant valuable assets in addition to his shareholder interest in West (the "Cafesjian Pre-Sale Assets"; together the "Cafesjian Proceeds" and the "Cafesjian

Pre-Sale Assets" will be referred to as the "Cafesjian Holdings").

### Employment - Cafesjian Family Office

19.     On August 29, 1996, Cafesjian hired Waters to assist in the development of a strategy for the investment and use of the Cafesjian Holdings; and to implement those strategies and to manage the Cafesjian Holdings through what is best described as, and commonly referred to as, a family office (for Cafesjian the "Cafesjian Family Office").

20.     The Cafesjian Family Office was formed to manage the personal, business and philanthropic affairs of Cafesjian.  Cafesjian created GLC Enterprises as one of the means of implementing the Cafesjian Family Office.

21.     GLC Enterprises was the conduit through which Cafesjian was to compensate Waters and through which the Cafesjian Family Office was to be operated on behalf of Cafesjian.  At the time Cafesjian employed Waters, Cafesjian executed a General Understanding of Terms of Employment (the "Employment Agreement").  A copy of the Employment Agreement is attached and incorporated herein as Exhibit A.

22.     Waters was employed by Cafesjian beginning October 1, 1996.  Waters resigned his position with GLC Enterprises on March 30, 2009.  Waters continued in Cafesjian's employ in various capacities through approximately mid-2011

23.     On information and belief, from the date of GLC Enterprises' formation through the date of this Complaint, Cafesjian has been and remains the sole shareholder of GLC Enterprises, and Cafesjian has been and remains a Director, President and CEO of GLC Enterprises.

4

24.     From 1996 through May 1, 2009, Cafesjian appointed Waters as a Director and Vice President of GLC Enterprises.

25.     Cafesjian is the founder of the CFF.  On information and belief, from the date of the CFF's formation through the date of this Complaint, Cafesjian has been and remains in full control of the CFF (through Cafesjian's absolute right to appoint and remove directors), and Cafesjian has been and remains a Director, President and CEO of the CFF.

26.     From the formation of the CFF on December 27, 1996, though May 1, 2009, Cafesjian appointed Waters as a Director and Vice President of the CFF.

27.     Cafesjian paid compensation to Waters through GLC Enterprises. Cafesjian made regular monthly transfers from his personal funds to GLC Enterprises to cover the majority of Waters compensation.  Cafesjian also made periodic contributions to the CFF, and the CFF, in exchange for services provided by Waters to the CFF, made regular monthly transfers to GLC Enterprises to cover the balance of Waters compensation.

28.     Waters, working for Cafesjian in his capacity as the head of the Cafesjian Family Office, developed, implemented and managed Cafesjian's personal, business and philanthropic affairs.    In fulfilling his role in connection with the Cafesjian Family Office, Waters provided Cafesjian with research, analysis, strategy, tactics, negotiation, implementation and management of Cafesjian's ideas and concepts.  At Cafesjian's direction, with Cafesjian's authorization, and for Cafesjian's benefit, Waters performed a variety of tasks, including, but not limited to:

a.      Instrumental in the conceptualization and formation of The Cafesjian Family Foundation, and the development, implementation and management thereof;

b.      Instrumental in the conceptualization and formation of the TomKat Limited Partnership for tax and estate planning purposes, and the development, implementation and management thereof;

c.      Negotiating, acquiring and managing a portfolio of over $100 million in commercial and residential real estate.

d.      Negotiating, acquiring and managing over $20 million in private equity investments;

e.      Assisting with the formation of and managing several trusts for Cafesjian and his family;

f.      Negotiating, initiating, acquiring and managing over $30 million in the CFF program related investments in media, energy and financial services in the Republic of Armenia;

g.      Instrumental in the conceptualization and formation of the Cafesjian Museum Foundation ("CMF"), and the development, implementation and management thereof, including negotiating and securing the contribution of the Cascade and over 30 acres of prime real estate valued at over $20 million in the heart of the city of Yerevan, the capital of the Republic of Armenia.

h.      Supervising and managing the CMF during the design and development of the $30 million first phase of the Cafesjian Center for the Arts;

6

i.      Negotiating and securing the purchase of five contiguous parcels of prime real estate valued at over $40 million in the heart of Washington, D.C., for the development of the proposed Armenian Genocide Museum and Memorial;

j.      Identifying, retaining and overseeing professional investment managers at Private Capital Management and Kopp Investment Advisors;

k.      Identifying and negotiating significant reductions in asset management fees paid to Northern Trust; and

l.      Performing countless other personal and business related services.

29.     In performing his duties for Cafesjian, Waters developed a very close and intense business and personal relationship with Cafesjian.  Cafesjian and Waters were in contact nearly every day.  Cafesjian and Waters frequently met in person, and when it was not convenient to do so, Cafesjian and Waters were in constant communication by phone, fax and/or email.  Cafesjian and Waters would commonly communicate five to ten or more times a day, both during regular business hours as well as on evenings and weekends.  Cafesjian expected Waters to be on call 24 hours a day, 7 days a week.

30.     During their frequent interactions, Cafesjian and Waters organized various strategies with regard to investments, operations, philanthropic programs and disbursement of monies.  At Cafesjian's direction and with Cafesjian's authorization, Waters would implement and manage Cafesjian's investments, operations, philanthropic programs and disbursement of monies.

31.     As Cafesjian rarely drove a car, Cafesjian relied on Waters and others to be Cafesjian's chauffeur and to escort Cafesjian as needed.  Together, Cafesjian and

7

Waters attended business meetings, social affairs, political gatherings, Cafesjian's medical appointments, and shopped and dined together.

32.     As a part of Waters' duties, Waters was also required to travel with Cafesjian and on Cafesjian's behalf.   Cafesjian and Waters made numerous trips together to a variety of locations throughout the United States, and to the Republic of Armenia and other foreign countries.  On Cafesjian's behalf, Waters made over 40 trips to the Republic of Armenia, and Waters frequently traveled to Florida, New York, Washington D.C, and other locations throughout the United States and Europe.  During the time that Cafesjian employed Waters, Waters was away from home for significant periods of the time.

33.     Cafesjian often made Waters a guest in his homes in Minnesota, Florida and New York.

34.     Waters found Cafesjian to be a brilliant, creative and ambitious person with prolific hopes, dreams and passions.  Waters was inspired by Cafesjian and adopted many of Cafesjian's causes as his own, particularly those involving Armenian issues.   Waters took great pride in his work and in his association with Cafesjian.

35.     Waters also found Cafesjian to be a very private man.  And although Cafesjian appreciated the recognition and public accolades that came to him as a result of his extensive philanthropic endeavors, Cafesjian personally shunned the spotlight, and demanded strict confidentiality regarding his business and personal affairs.  Waters frequently served as Cafesjian's proxy at business, social, political and philanthropic events.

8

36.     Cafesjian was highly respected as a thoughtful entrepreneur, patriotic Armenian, and generous philanthropist - an image of Cafesjian that Waters continuously promoted.   Cafesjian's positive public persona was created, in large part, though Waters' efforts.

37.     Waters also came to know Cafesjian's darker, less pleasant side and many of Cafesjian's most guarded secrets.   Cafesjian was extremely self-centered, exhibited what appeared to me to be narcissistic characteristics and regularly exhibited delusions of grandeur.   Cafesjian also suffered intense paranoia and frequent, almost daily, outbursts of anger.   Waters most often bore the brunt of Cafesjian's anger, and Waters regularly served as the shield for others, protecting them from Cafesjian's outbursts.

38.     Cafesjian would constantly change his mind.   Cafesjian would frequently make commitments, then often refuse or alter the commitments.   It was almost always left to Waters to remind Cafesjian of his commitments, and/or to renegotiate the commitments based on Cafesjian's altered position.

39.     During the period Cafesjian employed Waters, as each year passed, Cafesjian's darker, less pleasant side became more prevalent, making it increasingly difficult for Waters to protect himself and others from Cafesjian's anger, whimsicality and capriciousness.

40.     By March of 2009, Waters, despite his respect for Cafesjian and notwithstanding all of the good work that Cafesjian and Waters had accomplished, could no longer tolerate Cafesjian's volatility and abusive behavior.   Waters resigned from

9

GLC Enterprises on March 30, 2009.  And while removed from day-to-day contact with Cafesjian, Waters remained in Cafesjian's employ in various capacities though approximately mid-2011.

## Compensation History 1996-1999

41.    Periodically throughout the term of Waters' employment, Cafesjian and Waters would make adjustments to the Employment Agreement.  As a general rule, for employees of Cafesjian, base compensation was reviewed and adjusted in or around July of each year, and bonuses were awarded and paid in or around December of each year.

42.    From October 1, 1996, through December 31, 1999, Cafesjian adjusted Waters annual base salary ("Base Compensation") four times, and paid Waters four annual incentive bonuses ("Incentive Compensation").

43.    For the years 1996 through 1999, Cafesjian paid Waters the following Base Compensation and Incentive Compensation:

| Year | Base Compensation | Incentive Compensation |
|------|-------------------|------------------------|
| 1996 | $21,000.00 | $9,000.00 |
| 1997 | $120,000.00 | $10.000.00 |
| 1998 | $132,500.00 | $10,000.00 |
| 1999 | $147,500.00 | $12,500.00 |

## Modified Employment Agreement

44.    In early 1999, Cafesjian and Waters attended a wealth management conference sponsored by Northern Trust and held at the Ritz-Carlton in Naples, Florida. One of the presentations at the conference was made by Sara Hamilton the founder

and CEO of the Family Office Exchange ("FOX").  FOX provides consulting services to family offices on structure, best practices and succession planning.

45.    Immediately after the FOX presentation, at the insistence of Cafesjian, Cafesjian and Waters met with Ms. Hamilton in the lobby of the Ritz-Carlton.  Cafesjian expressed a concern that he may be paying too much in fees, salaries and other expenses in the operation of the Cafesjian Family Office.  Cafesjian was anxious to obtain an outside, professional analysis of the comparative effectiveness and efficiency of the Cafesjian Family Office.  Cafesjian requested a proposal from FOX for consulting services for the Cafesjian Family Office.

46.    On or about March 5, 1999, FOX submitted a proposal to Cafesjian for "the development of an operations review document that provides goals and guidelines for the Cafesjian family office."  The proposed fee for the FOX consulting services was $75,000.00, with one-half of the fee to be paid before the start of the consulting engagement, and the balance of the fee to be due upon Cafesjian's receipt of the final review document.  Cafesjian accepted the FOX proposal, and on or about May 13, 1999, Cafesjian directed Waters to make payment to FOX in the amount of $37,500.00 for the first half of the FOX consulting fee.

47.    On or about November 12, 1999, FOX sent Cafesjian the FOX assessment of the Cafesjian Family Office.  In the FOX cover letter transmitting the assessment to Cafesjian, Anne Knutson Hargrave, Managing Director of Consulting Services for FOX wrote, "We are sending two copies of the report for your [Cafesjian's] review and have held a copy intended for John Waters, pending your approval to send it

to him [Waters]."  Cafesjian subsequently authorized FOX to send a copy of the report to Waters.

48.     The FOX report indicated that the efficiency of the Cafesjian Family Office compared very favorably with other family offices of a similar size (approximately $250,000,000 in assets) and scope, and though effective, the Cafesjian Family Office would likely be more effective with additional investment in additional resources, primarily staffing resources.  Per the FOX analysis, the Cafesjian Family Office only expended one-fifth of the median amount spent by other family offices of similar size.

49.     The FOX report also indicated that compared to his peers, Waters was overworked and undercompensated.

50.     Upon his ultimate review of the report, Cafesjian became infuriated. Despite the relatively favorable report by FOX, Cafesjian chose to focus on that fact that Fox sent a copy of the report to Waters.  That fact that Waters received a copy of the report that indicated Waters was overworked and undercompensated made Cafesjian very angry.  The fact that Cafesjian had authorized FOX to send Waters a copy of the report did not exonerate FOX from responsibility.  As a consequence, Cafesjian adamantly refused any further communication with FOX and directed Waters not to pay the balance of the FOX consulting fee.

51.     As a consequence of the FOX report, Cafesjian expressed to Waters Cafesjian's concern that Waters would leave Cafesjian's employ for better compensation elsewhere.   In December 1999, Cafesjian initiated a renegotiation of the Employment Agreement and, in particular, the compensation provided for therein.

52.     Cafesjian proposed that Waters compensation be calculated as a

percentage of the sum of the value of all of the Cafesjian Holdings.  Cafesjian told Waters that he wanted the growth in Waters future compensation to be directly tied to the rate of growth in the value of the Cafesjian Holdings.  Cafesjian offered Waters revised terms of compensation, and Waters accepted Cafesjian's offer.  As a result, the following modifications were made to the Employment Agreement effective January 1, 2000 (the "Modified Employment Agreement", together, the Employment Agreement and the Modified Employment Agreement are the "Employment Agreements"):

      a.      Waters' annual base compensation was set at the equivalent of 20 basis points (20/100ths of 1% or the equivalent of $2.00 for every $1,000.00 of assets) of the value of the Cafesjian Holdings (the "Modified Base Compensation");

      b.      Part of Waters' annual Modified Base Compensation would be paid on a current basis ("Current Base Compensation') and part would be paid on a deferred basis (the "Deferred Base Compensation");

      c.      Waters would receive annual incentive bonus awards of up to the equivalent of 5 basis points (5/100ths of 1% or the equivalent of $0.50 for every $1,000.00 of assets) of the value of the Cafesjian Holdings (the "Modified Incentive Compensation");

      d.      Part of Waters' annual Modified Incentive Compensation would be paid on a current basis ("Current Incentive Compensation') and part would be paid on a deferred basis (the "Deferred Incentive Compensation");

      e.      The Deferred Base Compensation and Deferred Incentive Compensation would be paid at the earlier of:  i. Cafesjian's directive to pay; ii.

13

the time of some significant asset sale or other liquidity event within the Cafesjian Holdings; iii. Cafesjian's death, likely as part of Cafesjian's estate plan; iv. or upon the termination of Waters employment by Cafesjian (a "Triggering Event").

f.    The co-investment option contained in the Employment Agreement would be terminated; and

g.    All other provisions of the Employment Agreement would remain unchanged.

### Compensation History 2000 - 2004

53.    Beginning in 2000, and each year thereafter through 2008, as part of the regular annual review of base compensation for all Cafesjian employees conducted in or about July of each year, and as part of the regular annual review and award of bonus compensation for all Cafesjian employees conducted in or about December of each year, Cafesjian and Waters would review the estimated value of the Cafesjian Holdings, and the approximate amounts Waters earned in Modified Base and Inventive Compensation, the amounts actually paid Waters in Current Base and Incentive Compensation, and the approximate amounts Cafesjian owed to Waters in Deferred Base and Incentive Compensation.

54.    Based on the compensation provisions of the Modified Employment Agreement, for the years 2000 through 2004 the approximate amounts Waters earned in Modified Base Compensation, the amounts actually paid Waters in Current Base Compensation, and the approximate amounts Cafesjian owes to Waters in Deferred Base Compensation are as follows:

| Year | Estimated Value of Cafesjian Holdings[1] | Modified Base Comp 20 bps | Current Base Comp | Deferred Base Comp | Cumulative Deferred Base Comp |
|------|------|------|------|------|------|
| 2000 | $231,500,000 | $463,000 | $167,000 | $296,000 | $296,000 |
| 2001 | $230,600,000 | $461,000 | $173,000 | $288,000 | $584,000 |
| 2002 | $238,000,000 | $476,000 | $191,000 | $285,000 | $869,000 |
| 2003 | $250,000,000 | $500,000 | $200,000 | $300,000 | $1,169,000 |
| 2004 | $258,000,000 | $516,000 | $250,000 | $266,000 | $1,435,000 |

55.     Based on the compensation provisions of the Modified Employment Agreement, for the years 2000 through 2004, the approximate amounts Waters earned in Modified Incentive Compensation, the amounts actually paid Waters in Current Incentive Compensation, and the approximate amounts Cafesjian owes to Waters in Deferred Incentive Compensation are as follows:

| Year | Estimated Value of Cafesjian Holdings | Modified Incentive Comp 5 bps | Current Incentive Comp | Deferred inventive Comp | Cumulative Deferred inventive Comp |
|------|------|------|------|------|------|
| 2000 | $231,500,000 | $115,000 | $28,000 | $87,000 | $87,000 |
| 2001 | $230,600,000 | $115,000 | $16,500 | $98,000 | $186,000 |
| 2002 | $238,000,000 | $119,000 | $25,000 | $94,000 | $280,000 |
| 2003 | $250,000,000 | $125,000 | $0 | $125,000 | $405,000 |
| 2004 | $258,000,000 | $129,000 | $40,000 | $89,000 | $494,000 |

56.     By the end of 2004, Cafesjian owed Waters approximately $1,435,000 in Deferred Base Compensation and approximately $494,000 in Deferred Incentive Compensation, a total of approximately $1,929,000.

---

[1] The determination of the actual base and incentive compensation to be determined after a final accounting of the annual valuation of the Cafesjian Holdings.

## 2005 Loan Agreement

57.    In 2005, the relationship between Cafesjian and Waters was under significant and increasing strain.   Waters remained overworked.   Waters was responsible for the management and supervision of the Cafesjian Holdings, which had grown to include over 30 Cafesjian-related entities.  The demands of Waters' position required extensive travel to the Republic of Armenia, New York, Florida, Washington DC and numerous other locations.

58.    Cafesjian's health was also an issue.   Cafesjian was easily tired, increasingly forgetful and irritable, and prone to even more frequent angry outbursts. Cafesjian made ever-increasing demands on Waters' time.  Waters was expected to be available 24 hours a day.  Most weeks Waters was working seven days at an average of 12 to 14 hours per day.  At an average of at least once a month, Waters stayed overnight in his office to complete some significant task or negotiation.[2]

59.    From 1997 through 2004, Waters had taken fewer than 10 of his 80 accrued vacation days, fewer than 10 of his 40 paid sick days, and fewer than 40 of his 80 accrued holidays.  The workload was placing severe stress on Waters, his family and his home life. That strain was apparent in the workplace.

60.    In July of 2005, during the regular annual review of base compensation for Cafesjian employees, Waters, concerned by Cafesjian's health and the ever increasing amount of deferred compensation owed to him by Cafesjian, initiated a conversation

---

[2] Many of Cafesjian's philanthropic programs and program-related investments were made in the Republic of Armenia where the time is set 9 or 10 hours ahead of the time at the Cafesjian offices in Florida or Minnesota. Waters would need to schedule calls very late in the evening or very early in the morning to make contact during normal business hours in Armenia.

with Cafesjian about payment of the deferred compensation. Cafesjian was upset and angered by the conversation. Cafesjian refused to make a full or significant partial payment of the deferred compensation, and Cafesjian refused to increase the rate of current payout on the base compensation. Waters tendered his resignation.

61.     Cafesjian convinced Waters to stay in Cafesjian's employ by offering to loan Waters funds against the amount Cafesjian owed to Waters in deferred compensation. Based on Cafesjian's repeated assurances that Cafesjian "would make it up to him [Waters]," Waters agreed to remain in Cafesjian's employ. Waters agreed to accept periodic, as-needed advances as a loan from Cafesjian ("Loan"). The Loan would be non-interest bearing, secured by the deferred compensation, and due and payable, in whole or in part, at the time of a Triggering Event where Waters received payment from Cafesjian of any Deferred Base Compensation or any Deferred Incentive Compensation, and in an amount or amounts not greater than the net after tax proceeds to Waters from a payment by Cafesjian to Waters of any Deferred Base Compensation or any Deferred Incentive Compensation.

62.     Cafesjian once again repeated his promise to Waters and led Waters to believe that he would ultimately satisfy his outstanding deferred compensation obligation to Waters in the form of a bonus or gift at the time of a Triggering Event, such as a significant asset sale or other liquidity event, or at the time of Cafesjian's death as a part of Cafesjian's estate plan.

63.     Beginning in 2005, and continuing through 2009, Cafesjian made periodic, as-needed advances to Waters under the Loan as follows:

| YEAR | LOAN ADVANCE | CUMULATIVE LOAN BALANCE |
|------|-------------:|------------------------:|
| 2005 | $74,000 | $74,000 |
| 2006 | $516,000 | $590,000 |
| 2007 | $495,000 | $1,085,000 |
| 2008 | $522,000 | $1,607,000 |
| 2009 | $200,500 | $1,807,500 |

64.    From approximately December of 2005 trough the end of 2008, Cafesjian and Waters would review the cumulative outstanding loan balance during the regular annual review of base compensation in or around July of each year and during the annual review and award of bonuses in or around December of each year.

65.    The current outstanding balance on the Cafesjian Loan to Waters is approximately $1,807,500.

### Compensation History 2005 - 2009

66.    Based on the compensation provisions of the Modified Employment Agreement, for the years 2005 through 2009 the approximate amounts Waters earned in Modified Base Compensation, the amounts actually paid Waters in Current Base Compensation, and the approximate amounts Cafesjian owes to Waters in Deferred Base Compensation are as follows:

| Year | Estimated Value of Cafesjian Holdings | Modified Base Comp 20 bps | Current Base Comp | Deferred Base Comp | Cumulative Deferred Base Comp |
|------|------|------|------|------|------|
| 2005 | $286,000,000 | $572,000 | $250,000 | $322,000 | $1.757,000 |
| 2006 | $292,000,000 | $584,000 | $250,000 | $334,000 | $2,091,000 |
| 2007 | $321,000,000 | $642,000 | $250,000 | $392,000 | $2,483,000 |
| 2008 | $300,000,000 | $600,000 | $250,000 | $350,000 | $2,833,000 |
| 2009 | $242,000,000 | $121,000 | $62,500 | $58,500 | $2,891,000 |

18

67.     As a result of the Loan agreement, from 2005 to 2009 Cafesjian did not increase the rate of payment to Waters of the Current Base Compensation.

68.     Based on the compensation provisions of the Modified Employment Agreement, for the years 2005 through 2009 the approximate amounts Waters earned in Modified Incentive Compensation, the amounts actually paid Waters in Current Incentive Compensation, and the approximate amounts Cafesjian owes to Waters in Deferred Incentive Compensation are as follows:

| Year | Estimated Value of Cafesjian Holdings | Modified Incentive Comp 5 bps | Current Incentive Comp | Deferred inventive Comp | Cumulative Deferred inventive Comp |
|---|---|---|---|---|---|
| 2005 | $286,000,000 | $143,000 | $50,000[3] | $93,000 | $587,000 |
| 2006 | $292,000,000 | $146,000 | $60,000 | $86,000 | $673,000 |
| 2007 | $321,000,000 | $160,500 | $40,000 | $120,500 | $794,000 |
| 2008 | $300,000,000 | $150,000 | $0 | $150,000 | $944,000 |
| 2009 | $242,000,000 | $30,250 | $0 | $30,250 | $974,000 |

69.     By the end of March 2009, Cafesjian owed Waters approximately $2,891,000 in Deferred Base Compensation and approximately $974,000 in Deferred Incentive Compensation, a total of approximately $3,875,000.

**Compensation - Vacation Time, Holiday Pay and Sick Leave**

70.     Per the terms of the Employment Agreement, each year of employment

---

[3] In 2005, Cafesjian authorized a Current Incentive Bonus for Waters of $50,000. Waters asked Cafesjian to direct $25,000 to the AGM&M in his name, which Cafesjian did. Therefore, the Current Incentive Bonus paid in 2005 was $25,000.

Waters was entitled to two weeks of paid vacation, 10 paid holidays, and 5 paid sick days.

71.     Per Cafesjian and company policy at GLC Enterprises, employees were able to accrue and accumulate unused vacation days, holidays and sick leave,

72.     From October 1, 1996 through March 30, 2009 Waters, in accordance with the terms of the Employment Agreement, had accrued a total of 25 weeks of vacation time.  During that time period Waters took fewer than three weeks of vacation.

73.     From October 1, 1996 through March 30, 2009 Waters, in accordance with the terms of the Employment Agreement, had accrued a total of 125 days of paid holiday time.  During that time period, Waters took fewer than 60 paid holidays,

74.     From October 1, 1996 through March 30, 2009 Waters, in accordance with the terms of the Employment Agreement, had accrued a total of 62.5 days of paid sick leave.  During that time period, Waters took fewer than 10 paid sick days.

75.     From October 1, 1996 through March 30, 2009 Waters, in accordance with the terms of the Employment Agreement, had a total of approximately 11 months of accrued and unused vacation time, holiday pay and sick leave.

76.     In 2009, Waters was earning approximately $40,000.00 per month in Base Compensation.  The estimated Cafesjian obligation for the eleven months vacation time, holiday pay and sick leave due Waters is approximately $440,000.00

**Additional Special Bonus – AGM&M Litigation**

77.     In April of 2007, Cafesjian entered into litigation involving the Armenian Genocide Museum and Memorial ("AGM&M"), a proposed museum project in

20

Washington, D.C. intended to commemorate the Armenian Genocide (the "AGM&M Litigation"). Waters, in the course of carrying out his duties for Cafesjian, both as a Cafesjian appointed Vice President of the CFF and as a Cafesjian appointed trustee and officer of AGM&M, became a named party in the AGM&M Litigation.

78.    In 2007, Cafesjian first promised and thereafter made repeated promises to Waters of a "significant bonus" in the event of a positive outcome in the AGM&M Litigation. Cafesjian led Waters to believe that "significant" would be 1% to 2% of the value of assets recovered by Cafesjian in the AGM&M Litigation. Cafesjian defined a positive outcome of the AGM&M Litigation as Cafesjian gaining control over the museum and memorial project, either through Cafesjian control of the AGM&M or by the transfer of assets from the AGM&M to the CFF.

79.    In reliance on Cafesjian's promise, from the outset of the AGM&M Litigation in 2007, Waters has expended a significant amount of his time, energy and personal funds in support of and in obtaining a positive outcome of the AGM&M Litigation.

80.    As a result of the AGM&M Litigation, assets valued in excess of $40,000,000.00 have been transferred from AGM&M to the CFF. Waters has earned and is entitled to an additional special bonus in connection with the AGM&M Litigation in an amount of 1% to 2%  (not less than $400,000.00) of the value of the real estate assets transferred from the AGM&M to the CFF.

**Additional Special Bonus – Sale of the CFF Program Related Financial Services Holdings**

81.     In 2008, Cafesjian directed Waters to have the CFF sell the CFF's program related financial services holdings in the Republic of Armenia.

82.     In 2008, in conjunction with the proposed sale of the CFF program related financial services holdings, Cafesjian first promised and thereafter made repeated promises, to Waters of a "significant bonus" upon the completion of the sale.  Cafesjian led Waters to believe that "significant" would be 1% to 2% of the proceeds received by the CFF through a sale of the CFF's program related investment in the financial services holdings.

83.     In reliance upon Cafesjian's promise, from the outset of the sale process in 2008 through the time of the sale in 2011, Waters expended a significant amount of his time and energy in supporting and obtaining a sale of the CFF's program related financial services holdings.

84.     On information and belief, as a result of the sale of the CFF's financial services holdings, the CFF received cash and other assets valued in excess of $15,000,000.00.  Waters has earned and is entitled to an additional special bonus in connection with the sale of the CFF's program related financial services holdings in an amount of 1% to 2%  (not less than $150,000.00) of the value of the assets transferred to the CFF.


**Summary of Unpaid Compensation**

85.     Cafesjian has not paid Waters:

22

a.      Approximately $2,891,000 in Deferred Base Compensation;

b.      Approximately $974,000 in Deferred Incentive Compensation;

c.      Approximately $440,000 for the approximately 11 months of accrued and unused vacation time, holiday pay and sick leave;

d.      Approximately $400,000 to $800,000 for the additional special bonus for Waters' work in resolving the AGM&M Litigation; and

e.      Approximately $150,000 to $300,000 for the additional special bonus for his work on the sale of CFF's program related financial services holdings.

### Waters' Efforts to Secure Payment of Outstanding Compensation

86.     In April of 2009, Waters contacted GLC Enterprises to request a calculation of his accrued and unused vacation time, holiday pay and sick leave. Waters never received a response.

87.     Again, in November of 2010, Waters approached Cafesjian to discuss the outstanding compensation Cafesjian owed to Waters.  Cafesjian refused to discuss the matter.

### Indemnification

88.     Waters, as both an employee of Cafesjian and in his capacity as an employee, officer and director of the entities in the Cafesjian Holdings which were owned and or controlled by Cafesjian, is indemnified by Cafesjian and, for actions related to a specific entity in the Cafesjian Holdings which were owned and or controlled by Cafesjian, by the entities in the Cafesjian Holdings, from and against any and all

expenses and liabilities incurred by Waters or imposed on Waters in connection with any action in which Waters is or may be made party by reason of Waters having been an employee of Cafesjian or an employee, officer and or director of an entity in the Cafesjian Holdings which were owned and or controlled by Cafesjian.

89.     From 1998 forward, Cafesjian and Waters have been actively engaged in the effort to develop a museum and memorial to commemorate the victims and survivors of the Armenian Genocide.  During that period, Waters, acting in his various capacities for Cafesjian, including, but not limited to: i. as Cafesjian's designated personal spokesperson and representative; ii. as an employee of Cafesjian; iii. as a Cafesjian appointed officer and director of the CFF; and iv. as a Cafesjian appointed officer and trustee of the AGM&M, carried out a variety of tasks at the direction of and for the benefit of Cafesjian, the CFF and the AGM&M.

90.     In 2000, Cafesjian and the CFF made significant donations and a loan to the Armenian Assembly of America, a Washington, D.C. based national advocacy organization advocating on behalf of the Armenian American community (the "Assembly"), for the acquisition of real property in Washington, D.C. to be used to house the proposed museum and memorial.

91.     Waters had the lead role in the negotiation of the Cafesjian and the CFF donations to the Assembly in 2000, as well as with the identification, negotiation and purchase of the real estate acquired through the Assembly in 2000.

92.     In 2003, Cafesjian and the CFF made additional significant donations to the Assembly in furtherance of the museum and memorial project, and a new independent entity, the Armenian Genocide Museum and Memorial, Inc., was created to

24

hold the project assets and to develop the proposed museum and memorial.

93.     Again, Waters had the lead role in the negotiation of the Cafesjian and the CFF donations to the Assembly in 2003, as well as with the negotiation and transfer of the real estate transferred to the AGM&M.  At Waters suggestion and with Cafesjian's approval, Waters negotiated the inclusion of a reversion clause into the 2003 grant agreement entered into by Cafesjian and the CFF, and the Assembly (Grant Agreement).  The reversion clause ultimately protected Cafesjian and the CFF from the failure of the Assembly and the AGM&M to complete the museum and memorial project as contracted in the Grant Agreement.

94.     In April of 2007, Cafesjian and the CFF initiated litigation against the Assembly, the AGM&M Litigation, to, among other things, enforce the terms of the Grant Agreement.  In June of 2007, the Assembly countersued, and Waters was named as a Defendant in the counterclaim.

95.     As an employee of Cafesjian and an officer and director of the CFF acting on Cafesjian's behalf and at Cafesjian's direction, Waters is indemnified by Cafesjian and the CFF from and against any costs and expenses Waters incurred related to any actions undertaken by Waters at the direction of Cafesjian and/or for the benefit of Cafesjian or the CFF, including but not limited to those related to the AGM&M and/or the AGM&M Litigation.

96.     From April 1, 2009 through early 2011, Waters worked an average of twenty to thirty hours a week on resolving the AGM&M Litigation.  In the months of October and November of 2010, Waters worked an average of sixty to seventy hours a week preparing for and attending the trial in the AGM&M Litigation.

97.   Waters provided services to Cafesjian in the AGM&M Litigation at Cafesjian's request and for Cafesjian's benefit, including, but not limited to, the following:

a.   Attending nearly every deposition, assisting counsel in preparing questions for witnesses, and preparing written summaries and analysis of each deposition for Cafesjian and his counsel;

b.   Assisting with the drafting and review of motions and pleadings;

c.   Reviewing and commenting on motions and pleadings filed by the opposing party;

d.   Assisting in the development of litigation strategy;

e.   Assisting in the compilation, review and analysis of evidence;

f.   Assisting in preparing friendly witnesses for testimony at trial;

g.   Spending over four weeks in Washington, D.C., working with Cafesjian's counsel on trial preparation and participating in every day of the trial proceedings;

h.   Providing Cafesjian and his counsel with analysis of various depositions, testimony and pleadings, as well as with options for and recommendations on responses and litigation strategy; and

i.   Testifying in full support of the Cafesjian causes.

98.   For the period from April 1, 2009 though mid-2011, the estimated value of the services Waters provided to Cafesjian and the CFF in the pursuit of their respective claims in the AGM&M Litigation is approximately $511,000.00.

99.   Neither Cafesjian nor the CFF have reimbursed Waters for costs and

26

expenses incurred by Waters for the services Waters provided Cafesjian and the CFF in support of their respective claims in the AGM&M Litigation.

100.   Waters is entitled to receive at least $511,000.00 as reimbursement for the time and expenses Waters incurred between April 1, 2009 and mid-2011 for the services Waters provided Cafesjian and the CFF in support of their respective claims in the AGM&M Litigation.

## Cafesjian's Post Employment Treatment of Waters

101.   During the time that Cafesjian employed Waters, the relationship between Cafesjian and Waters was mostly positive, professional, and mutually beneficial.   In Waters, Cafesjian had, among other things, a loyal, dedicated, hard-working, and trustworthy employee.  Through Waters, Cafesjian was able to pursue and realize many of his dreams and to successfully engage in many financially and philanthropically rewarding activities.

102.   With Cafesjian, Waters found meaningful, gainful employment.  Through Cafesjian and the financial resources available to the Cafesjian Family Office, Waters was able to successfully develop, implement and manage an interesting variety of investments and emotionally rewarding social, political and philanthropic programs.

103.   Waters came to understand that Cafesjian was not an easy person to work for.  Cafesjian was extremely demanding, with high, sometimes unreasonably high, expectations.  As highlighted by the 1999 FOX analysis, Cafesjian was also extremely frugal, loath to expend funds on staff, training and other professional support.

104.   Despite the challenges, Waters found significant positives in Cafesjian's

character and took great pride in his work with and for Cafesjian.

105.   Waters decision to resign from GLC Enterprises and the day-to-day management of Cafesjian's affairs was not an easy decision.   Waters is an intensely loyal person.   Waters dedicated over a quarter of his life, over 15 years, to serving Cafesjian.   Waters gladly and enthusiastically poured his heart and soul into developing and managing businesses and philanthropic programs at Cafesjian direction and for Cafesjian's benefit.   Waters was prepared, willing and planning to spend the rest of his life serving Cafesjian, both during Cafesjian's remaining life, and after Cafesjian's death. Cafesjian's passions had become Waters' passions.   Waters had adopted Cafesjian's philanthropic goals as his own.   In many ways, Waters was Cafesjian's alter ego.

106.   Nevertheless, as each year passed, it became increasingly difficult for Waters to do his job.   Again, despite his respect for Cafesjian and notwithstanding all of the good work that Cafesjian and Waters had accomplished, by 2009 Waters could no longer tolerate Cafesjian's paranoia, lack of trust, volatility and abusive behavior.

107.   As a further example of Waters loyalty to Cafesjian and to the causes they mutually supported, even after resigning from GLC Enterprises and the management of the day-to-day operations of the Cafesjian Family Office, Waters continued to work at Cafesjian's direction on Cafesjian's behalf and for Cafesjian's benefit.   From April of 2009 through mid-2011, Waters remained in frequent contact with Cafesjian and Cafesjian's representatives.

108.   In April of 2009, shortly after Waters departure from GLC Enterprises, Waters also came to learn from various distraught Cafesjian representatives that Cafesjian had directed a significant and aggressive program of document destruction at

the Cafesjian Family Office, starting with the records in Waters' former office.

109.    In 2009, while communicating with various Cafesjian representatives, Waters came to learn that Cafesjian had hired several accountants and lawyers to go over the books and records of the Cafesjian Holdings.

110.    In 2009 and 2010, while communicating with various Cafesjian representatives, Waters came to learn that Cafesjian was threatening litigation against a list of Cafesjian's employees, business partners and advisors.  Waters was contacted several times by Cafesjian representatives to discuss litigation that Cafesjian was proposing to pursue against former employees, professional consultants and business partners.  In each instance, Waters found Cafesjian's allegations to be unfounded, and Waters recommended against litigation.

111.    Waters subsequently learned that Cafesjian was making outrageous and unfounded allegations that Waters had made improper use of Cafesjian funds, allegations that Cafesjian knew, or should have known, to be untrue.

112.    Despite those allegations, throughout 2009, 2010 and into 2011, Cafesjian took no action to pursue those allegations.  To the contrary, Cafesjian continued to employ Waters and Cafesjian and his representatives continued to rely on Waters services for a variety of tasks, including the successful execution of the sale of the CFF's program related investment in the financial services holdings and AGM&M Litigation, all the while praising Waters for his efforts.

113.    Then in July of 2011, after the successful execution of the sale of the CFF's program related investment in the financial services holdings and after the success in the AGM&M Litigation, Waters was contacted by Rick Ostrom, a private

investigator employed by Waypoint, Inc.  Mr. Ostrom indicated that he had been hired by the law firm of Greene Espel on behalf of Cafesjian to investigate Cafesjian's allegation that Waters had made unauthorized use of Cafesjian's money by diverting funds from Cafesjian's personal checking account to bank accounts under Waters' control.  Mr. Ostrom asked Waters to meet with him.

114.   Waters was shocked and offended, but not surprised, by the allegation. Waters knew Cafesjian to be both paranoid and vindictive, and that Cafesjian had made previous unfounded allegations of wrongdoing against several other individuals.

115.   Waters indicated to Mr. Ostrom that he was willing to meet and was eager to clear up any misunderstandings.  But Waters expressed his concern that in order to properly clear up any misunderstandings, Waters would be required to make disclosures of information that Cafesjian had asked Waters to hold in strict confidence. Given the seriousness of the allegations and the very sensitive personal and confidential nature of the information that would need to be discussed, in an effort to resolve the situation, in August of 2012 Waters offered to meet Mr. Ostrom under the following conditions:

      a.   that in addition to Waters and Mr. Ostrom, there would need to be at least two other individuals present at any meeting;

      b.   the additional individuals were to be selected by Cafesjian, subject to approval by Waters;

      c.   the designated individuals were to have been trusted by both Cafesjian and Waters;

d.      the designated individuals were to have been acquainted with both Cafesjian and Waters for a significant period of time; and

e.      Cafesjian would have also been required to provide the designated individuals with a letter, signed by Cafesjian, authorizing the designated individuals to hear what Waters would disclose and indemnifying the designated individuals from any consequences of holding that knowledge.   Waters was to receive a copy of the letter.

116.   Cafesjian refused to select individuals that met the criteria, and no meeting was held.

117.   After several months passed without further contact from Cafesjian or his representatives, in December 2012, Waters was contacted by an agent working for the Federal Bureau of Investigation (the "FBI").   The FBI agent indicated that Cafesjian or his representatives had made allegations against Waters, and that the FBI had opened an investigation.

118.   Waters believes that Cafesjian, angry with Waters over Waters' departure from the day-to-day operations of the Cafesjian Family Office, seeking to avoid paying his outstanding obligations to Waters, fearful of the sensitive and confidential information Waters possesses regarding Cafesjian, and bitter over the poor performance of the Cafesjian Holdings subsequent to Waters' departure, is intentionally working to cause harm to Waters and to Waters' reputation.

119.   Cafesjian, with a willful disregard of the facts and towards Waters' health and welfare, has taken several actions intended to intimidate, harass, and embarrass Waters and to damage Waters' personal and business reputation, including, but not

limited to:

      a.     Terminating contracts between Cafesjian and entities in the Cafesjian Holdings, and firms that Cafesjian deemed to be friendly to Waters, and therefore, disloyal to Cafesjian;

      b.     Threatening litigation against business partners Cafesjian deemed to be friendly to Waters and therefore, disloyal to Cafesjian;

      c.     Giving false or misleading information about Waters to Cafesjian employees, business partners, the CFF board members, and other Cafesjian advisors;

      d.     Claiming to have Waters' phone tapped;

      e.     Threatening other Cafesjian employees and business partners planning to attend Waters wedding; and

      f.     Hiring private investigators and presenting unfounded claims to the FBI.

119    As a proximate result of Cafesjian's intentional acts and the consequences proximately caused thereby, as hereinabove alleged, Waters suffered severe humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and body with damages in excess of $75,000.00.

## COUNT I

### BREACH OF CONTRACT - DEFERRED BASE COMPENSATION

120.    Plaintiff incorporates by reference each allegation in the above paragraphs 1-119 as if fully rewritten here.

121.   Per the terms of the Employment Agreements, for the period from January 1, 2000, through March 30, 2009, the Defendants owe Waters approximately $2,891,000 in additional Deferred Base Compensation.

122.   The end of Waters' employment by Cafesjian in mid-2011 and the CFF's sale of the financial services group in 2010 are qualifying Triggering Events under the Employment Agreements, obligating the Defendants to pay Waters the outstanding Deferred Base Compensation.

123.   The Defendants have breached the Employment Agreements by not paying Waters the approximately $2,891,000 in Deferred Base Compensation that is the Defendants are obligated to pay Waters.

124.   As a direct result of this breach, Waters has been damaged in excess of $2,891,000.

## COUNT II

### BREACH OF CONTRACT  - DEFERRED INCENTIVE COMPENSATION

125.   Plaintiff incorporates by reference each allegation in the above paragraphs 1-124 as if fully rewritten here.

126.   Per the terms of the Employment Agreements, for the period from January 1, 2000, through March 30, 2009, the Defendants owe Waters approximately $974,000 in additional Deferred Incentive Compensation.

127.   The end of Waters' employment by Cafesjian in mid-2011 and the CFF's sale of the financial services group in 2010 are qualifying Triggering Events under the Employment Agreements, obligating the Defendants to pay Waters the outstanding

Deferred Incentive Compensation.

128.   The Defendants have breached the Employment Agreements by not paying Waters the approximately $974,000 in Deferred Incentive Compensation that is the Defendants are obligated to pay Waters.

129.   As a direct result of this breach, Waters has been damaged in excess of $974,000.

## COUNT III

## BREACH OF CONTRACT  - VACATION PAY, HOLIDAY PAY AND SICK PAY

130.   Plaintiff incorporates by reference each allegation in the above paragraphs 1 thru 129 as if fully rewritten here.

131.   At the end of March, 2009, at the time of Waters resignation from GLC Enterprises, Waters had not fewer than 22 weeks (or approximately 5-1/2 months) of accrued, accumulated and unused vacation time, not fewer than 65 days (or approximately 3 months) of accrued, accumulated and unused holiday time, and not fewer than 52.5 days (or approximately 2 1/2 months) of accrued, accumulated and unused sick leave in the total amount of approximately $440,000.00.

132.   The Defendants have breached the Employment Agreements by not paying Waters the approximately $440,000 for the approximately 11 months of accrued, accumulated and unused vacation time, holiday time and sick leave that is the Defendants are obligated to pay Waters.

133.   As a direct result of this breach, Waters has been damaged in excess of $440,000.

134.   Although demand has been made for payment, no payment has been made.


## COUNT IV

## PROMISSORY ESTOPPEL – DEFERRED BASE COMPENSATION

135.   Plaintiff incorporates by reference each allegation in the above paragraphs 1 thru 134 as if fully rewritten here.

136.   In December of 1999 Cafesjian promised Waters and Cafesjian led Waters to believe that beginning January 1, 2000 the Defendants would pay Waters certain annual Modified Base Compensation of the equivalent of 20 basis points of the value of the Cafesjian Holdings.  Cafesjian promised to pay part of the Modified Base Compensation as Current Base Compensation, with that balance to be paid on a deferred basis as Deferred Base Compensation.  The Deferred Base Compensation would be deferred until Cafesjian experienced a Triggering Event.

137.   From January 1, 2000, through March 30, 2009, Waters acted in reliance upon Cafesjian's promises, providing Cafesjian with research, analysis, strategy, tactics, negotiation, implementation and management services for Cafesjian's personal, business and philanthropic affairs.

138.   From January 1, 2000, through March 30, 2009, Waters earned approximately $4,935,000.00 in Modified Base Compensation.

139.   From January 1, 2000, through March 30, 2009, as promised, the Defendants paid Waters approximately $2,044,000.00 in Current Base Compensation.

140.   The Defendants still owe Waters Deferred Base Compensation of

approximately $2,891,000.00.

141.    In keeping with Cafesjian's promises, the end of Waters' employment by Cafesjian in mid-2011 and the CFF's sale of the financial services group in 2010 are qualifying Triggering Events, obligating the Defendants to pay Waters the outstanding Deferred Base Compensation.

142.    The Defendants have breached Cafesjian's promises to Waters by failing to pay Waters the approximately $2,891,000 in Deferred Base Compensation that the Defendants are obligated to pay Waters.

143.    As a direct result of the Defendants' failure to pay Waters as promised, Waters has been damaged in excess of $2,891,000.


## COUNT V

## PROMISSORY ESTOPPEL – DEFERRED INCENTIVE COMPENSATION

144.    Plaintiff incorporates by reference each allegation in the above paragraphs 1 thru 143 as if fully rewritten here.

145.    In December of 1999 Cafesjian promised Waters and Cafesjian led Waters to believe that beginning January 1, 2000 the Defendants would pay Waters certain annual Modified Incentive Compensation of the equivalent of up to 5 basis points of the value of the Cafesjian Holdings.  Cafesjian promised to pay part of the Modified Inventive Compensation as Current Incentive Compensation, with that balance to be paid on a deferred basis as Deferred Incentive Compensation.  The Deferred Incentive Compensation would be deferred until Cafesjian experienced a Triggering Event.

146.    From January 1, 2000, through March 30, 2009, Waters acted in reliance

36

upon Cafesjian's promises, providing Cafesjian with research, analysis, strategy, tactics, negotiation, implementation and management services for Cafesjian's personal, business and philanthropic affairs.

147.   From January 1, 2000, through March 30, 2009, Waters earned approximately $1,233,000.00 in Modified Incentive Compensation.

148.   From January 1, 2000, through March 30, 2009, as promised, the Defendants paid Waters approximately $234,500.00 in Current Inventive Compensation.

149.   The Defendants still owe Waters Deferred Incentive Compensation of approximately $974,000.00.

150.   In keeping with Cafesjian's promises, the end of Waters' employment by Cafesjian in mid-2011 and the CFF's sale of the financial services group in 2010 are qualifying Triggering Events, obligating the Defendants to pay Waters the outstanding Deferred Incentive Compensation.

151.   The Defendants have breached Cafesjian's promises to Waters by failing to pay Waters the approximately $974,000.00 in Deferred Incentive Compensation that the Defendants are obligated to pay Waters.

152.   As a direct result of the Defendants' failure to pay Waters as promised, Waters has been damaged in excess of $974,000.00.

## COUNT VI

## PROMISSORY ESTOPPEL - VACATION PAY, HOLIDAY PAY AND SICK PAY

153.   Plaintiff incorporates by reference each allegation in the above paragraphs 1 thru 152 as if fully rewritten here.

154.   In August of 1996, Cafesjian executed a contract titled the General Understanding of Terms of Employment (the "Employment Agreement"), whereby Cafesjian promised to pay Waters for certain vacation days, sick days and holidays.

155.   In December of 1999, Cafesjian and Waters made oral modifications to the Employment Agreement (the "Modified Employment Agreement", together the Employment Agreement and the Modified Employment Agreement are the "Employment Agreements"), whereby Cafesjian reiterated his promise to pay Waters for certain vacation days, sick days and holidays.

156    At the end of March, 2009, at the time of Waters resignation from GLC Enterprises, Waters had not fewer than 22 weeks (or approximately 5-1/2 months) of accrued, accumulated and unused vacation time, not fewer than 65 days (or approximately 3 months) of accrued, accumulated and unused holiday time, and not fewer than 52.5 days (or approximately 2 1/2 months) of accrued, accumulated and unused sick leave in the total amount of approximately $440,000.00.

157.   The Defendants have breached Cafesjian's' promises to Waters by not paying Waters the approximately $440,000 for the approximately 11 months of accrued, accumulated and unused vacation time, holiday time and sick leave that the Defendants are obligated to pay Waters.

158.   As a direct result of this breach, Waters has been damaged in excess of

$440,000.

159.   Although demand has been made for payment, no payment has been made.


## COUNT VII

## PROMISSORY ESTOPPEL – ADDITIONAL SPECIAL BONUS - AGM&M LITIGATION

160.   Plaintiff incorporates by reference each allegation in the above paragraphs 1 thru 159 as if fully rewritten here.

161.   In 2007, Cafesjian first promised and thereafter made repeated promises, to Waters of a "significant bonus" in the event of a positive outcome in the AGM&M Litigation.  Cafesjian led Waters to believe that "significant" would be 1% to 2% of the value of assets recovered by Cafesjian in the AGM&M Litigation.  Cafesjian defined a positive outcome of the AGM&M Litigation as Cafesjian gaining control over the museum and memorial project, either through Cafesjian's control of the AGM&M or by the transfer of assets from the AGM&M to the CFF.

162.   In reliance on Cafesjian's promises, from the outset of the AGM&M Litigation in 2007 Waters has expended a significant amount of his time, energy and personal funds in support of and in obtaining a positive outcome of the AGM&M Litigation.

163.   As a result of the AGM&M Litigation, assets valued in excess of $40,000,000.00 were transferred from AGM&M to the CFF.   Waters is entitled to an additional special bonus in connection with the AGM&M Litigation in an amount of 1% to 2%  (not less than $400,000.00) of the value of the real estate assets transferred by the

AGM&M to the CFF.

164.   As a direct result of the Defendant's failure to pay Waters the AGM&M Litigation additional special bonus as promised, Waters has been damaged in excess of $400,000.


## COUNT VIII

### PROMISSORY ESTOPPEL – ADDITIONAL SPECIAL BONUS - SALE OF THE CFF PROGRAM RELATED FINANCIAL SERVICES HOLDINGS

165.   Plaintiff incorporates by reference each allegation in the above paragraphs 1 thru 164 as if fully rewritten here.

166.   In 2008, in conjunction with the proposed sale of the CFF program related financial services holdings, Cafesjian first promised, and thereafter made repeated promises, to Waters of a "significant bonus" upon the completion of the sale.  Cafesjian led Waters to believe that "significant" would be 1% to 2% of the proceeds received by the CFF through a sale of the CFF's program related investment in the financial services holdings.

167.   In reliance upon Cafesjian's promises, from the outset of the sale process in 2008 through the time of the sale in 2011, Waters expended a significant amount of his time and energy in supporting and obtaining a sale of the CFF's program related financial services holdings.

168.   On information and belief, as a result of the sale of the CFF's financial services holdings, the CFF received cash and other assets valued in excess of $15,000,000.00.  Waters is entitled to an additional special bonus in connection with the

40

sale of the CFF's program related financial services holdings in an amount of 1% to 2% (not less than $150,000.00) of the value of the assets transferred to the CFF.

169.   As a direct result of the Defendants' failure to pay Waters the sale of the CFF financial services additional special bonus as promised, Waters has been damaged in excess of $150,000.

## COUNT IX

## BREACH OF IMPLIED CONTRACT – INDEMNIFICATION

170.   Plaintiff incorporates by reference each allegation in the above paragraphs 1 thru 169 as if fully rewritten here.

171.   As an employee of Cafesjian and an employee, officer and or director of the CFF, GLC Enterprises and other entities within Cafesjian Holdings, Waters is indemnified by Cafesjian and, for actions related to a specific entity in the Cafesjian Holdings which were owned and or controlled by Cafesjian, by the entities in the Cafesjian Holdings, against any and all expenses and liabilities incurred by Waters or imposed on Waters in connection with any action in which Waters is or may be made party by reason of Waters having been an employee of Cafesjian or an employee, officer and or director of an entity in the Cafesjian Holdings which were owned and or controlled by Cafesjian..

172.   From April 1, 2009 through mid-2011, as result of following Cafesjian's directives in the formation, development and management of the AGM&M, Waters incurred costs and expenses in excess of $511,000.00 in supporting and defending

himself and Cafesjian and the CFF in the AGM&M Litigation.

173.   The Defendants owe Waters not less than $511,000 in costs and expenses incurred by Waters in the AGM&M Litigation.

174.   The Defendants have not reimbursed Waters for his costs and expenses in the AGM&M Litigation.

175.   As a direct result of the Defendants' failure to pay, Waters has been damaged in excess of $511,000.

## COUNT X

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Cafesjian)

176.   Plaintiff incorporates by reference each allegation in the above paragraphs 1 thru 175 as if fully rewritten here.

177.   Cafesjian is intentionally working to harm Waters and Waters' reputation.

178.   Cafesjian's conduct is intentional and malicious and done for the purpose of causing Waters to suffer humiliation, mental anguish, and emotional and physical distress.

179.   Cafesjian, with a willful disregard of the facts and towards Waters' health and welfare, has taken several actions intended to intimidate, harass, and embarrass Waters and to damage Waters' personal and business reputation, including, but not limited to:

   a.   Terminating contracts between Cafesjian and entities in the Cafesjian Holdings, and firms that Cafesjian deemed to be friendly to Waters,

and therefore, deemed by Cafesjian to be disloyal to Cafesjian;

   b.      Threatening litigation against business partners Cafesjian deemed to be friendly to Waters and therefore, deemed by Cafesjian to be disloyal to Cafesjian;

   c.      Giving false or misleading information about Waters to Cafesjian employees, business partners, the CFF board members, and other Cafesjian advisors;

   d.      Claiming to have Waters' phone tapped;

   e.      Threatening other Cafesjian employees and business partners planning to attend Waters wedding; and

   f.      Hiring private investigators and presenting unfounded claims to the FBI.

180.   Cafesjian's intentional actions have been harmful to Waters and have caused Waters severe emotional distress.

181.   As a proximate result of Cafesjian's intentional acts and the consequences proximately caused thereby, as hereinabove alleged, Waters suffered severe humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and body with damages in excess of $75,000.


## COUNT XI

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Cafesjian)

182.   Plaintiff incorporates by reference each allegation in the above paragraphs 1 thru 181 as if fully rewritten here.

183.    Cafesjian's negligent actions have caused harm to Waters and Waters' reputation.

184.    Cafesjian knew, or should have known, that his failure to exercise due care in his actions toward Waters would cause Waters severe emotional distress.

185.    Cafesjian, with a negligent disregard of the facts and towards Waters' health and welfare, has taken several actions that have intimidated, harassed, and embarrassed Waters and caused damage to Waters' personal and business reputation, including, but not limited to:

      a.    Terminating contracts between Cafesjian and entities in the Cafesjian Holdings, and firms that Cafesjian deemed to be friendly to Waters, and therefore, deemed by Cafesjian to be disloyal to Cafesjian;

      b.    Threatening litigation against business partners Cafesjian deemed to be friendly to Waters and therefore, deemed by Cafesjian to be disloyal to Cafesjian;

      c.    Giving false or misleading information about Waters to Cafesjian employees, business partners, the CFF board members, and other Cafesjian advisors;

      d.    Claiming to have Waters' phone tapped;

      e.    Threatening other Cafesjian employees and business partners planning to attend Waters wedding; and

      f.    Hiring private investigators and presenting unfounded claims to the FBI.

186.    Cafesjian's negligent actions have been harmful to Waters and have

caused Waters severe emotional distress.

187.   As a proximate result of Cafesjian's negligent acts and the consequences proximately caused thereby, as hereinabove alleged, Waters suffered severe humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and body with damages in excess of $75,000.

WHEREFORE, Waters requests the following relief:

1.   A declaration that the Defendants have breached the Employment Agreement and the Modified Employment Agreement by failing to pay Waters approximately $2,891,000 in Deferred Base Compensation, or in the alternative, a declaration that the Defendants have breached the promise to pay Waters by failing to pay Waters approximately $2,891,000 in Deferred Base Compensation, and a judgment against the Defendants, Cafesjian, GLC Enterprises and the CFF, in the amount of $2,891,000;

2)   A declaration that the Defendants have breached the Employment Agreement and the Modified Employment Agreement by failing to pay Waters approximately $974,000 in Deferred Incentive Compensation, or in the alternative, a declaration that the Defendants have breached the promise to pay Waters by failing to pay Waters approximately $974,000 in Deferred Incentive Compensation, and a judgment against the Defendants, Cafesjian, GLC Enterprises and the CFF, in the amount of $974,000;

3)   A declaration that the Defendants have breached the Employment Agreement and the Modified Employment Agreement by failing to pay Waters

approximately $440,000 for the approximately 11 months of accrued and unused vacation time, holiday pay and sick leave, or in the alternative, a declaration that the Defendants have breached the promise to pay Waters by failing to pay Waters approximately $440,000 for the approximately 11 months of accrued and unused vacation time, holiday pay and sick leave, and a judgment against the Defendants, Cafesjian, GLC Enterprises and the CFF, in the amount of $440,000;

4     A declaration that the Defendants have breached the promise to pay Waters by failing to pay approximately $400,000 to $800,000 for the additional special bonus for Waters' work in resolving the AGM&M Litigation, and a judgment against the Defendants, Cafesjian, GLC Enterprises and the CFF, in the amount of not less than $400,000;

5.     A declaration that the Defendants have breached the promise to pay Waters by failing to pay approximately $150,000 to $300,000 for the additional special bonus for Waters' work on the sale of CFF's program related financial services holdings, and a judgment against the Defendants, Cafesjian, GLC Enterprises and the CFF, in the amount of not less than $150,000;

6.     A declaration that the Defendants have breached the implied contract to indemnify Waters from costs incurred by Waters as a result of actions taken at Cafesjian's direction and for Cafesjian's benefit, including failing to reimburse Waters for approximately $511,000.00 in costs and expenses incurred by Waters in supporting Cafesjian and the CFF in the AGM&M Litigation, and a judgment against the Defendants, Cafesjian, GLC Enterprises and the CFF, in the amount of not less than $511,000;

46

7.    A declaration that Cafesjian has intentionally inflicted emotional distress on Waters and has caused Waters damages in excess of $75,000, or in the alternative, a declaration that Cafesjian has negligently inflicted emotional distress on Waters and has caused Waters damages in excess of $75,000;

8.    An award of all interest, costs, attorneys' fees, disbursements, and other expenses incurred to pursue this action; and

9.    That the Court grant such other relief as is just and proper.


## JURY DEMAND

Plaintiff demands a trail by jury on all issues so triable.


Respectfully submitted and signed this 13ᵗʰ day of March, 2012.

Signature of Plaintiff :

John Joseph Waters, Jr., Pro Se

Mailing Address:        11893 Dunhill Road
                        Eden Prairie, MN  55344

Telephone number:      (612) 804-3149