# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

John Joseph Waters, Jr.,

        Plaintiff,

    v.

Gerard Leon Cafesjian, G.L.C. Enterprises, Inc., and The Cafesjian Family Foundation, Inc.,

        Defendants.

---

Gerard Leon Cafesjian,

        Third-Party Plaintiff,

    v.

John Joseph Waters, Jr. and Cheri Kuhn Waters a/k/a Cheri Ann Kuhn,

        Third-Party Defendants.

Case No.: 12-cv-0648 RHK/LIB

**ANSWER, COUNTERCLAIM
and
THIRD-PARTY COMPLAINT**

## Introduction

1.    From mid-1998 to March 2009, Plaintiff John J. Waters, Jr. ("Waters") systematically exploited a position of trust with Defendant Gerard Leon Cafesjian. Over that period of time, he stole millions of dollars from Mr. Cafesjian. Waters concealed and disguised his illicit activities. Waters converted some of the money to cash that he took personally. He distributed additional sums to bank accounts that he owned solely or to others that he shared with, or were owned by, his then-girlfriend, now-wife, Cheri Kuhn Waters ("Kuhn").

1

2.     Mr. Cafesjian did not know that Waters abused his role and relationship with Mr. Cafesjian to enrich himself by transferring millions of dollars of Mr. Cafesjian's funds to his own benefit.

3.     Mr. Cafesjian discovered the diversion of funds by Waters only after Waters left his employment with G.L.C. Enterprises.

4.     When Waters learned that Mr. Cafesjian had discovered information about Waters' unauthorized conversions and thefts, Waters initiated this lawsuit in an audacious gambit to rationalize his illegal diversions of Mr. Cafesjian's funds.

5.     Waters' current claims, as stated in the Complaint, are inconsistent with documents and statements, including sworn testimony, that Waters has communicated in the past.

## ANSWER

Defendants Gerard Cafesjian ("Cafesjian"), G.L.C. Enterprises, Inc. ("GLC") and the Foundation, for their answer to the Complaint, state:

## **First Defense**

6.     The Complaint fails to state a claim upon which relief can be granted.

## **Second Defense**

7.     Defendants admit the allegations of paragraphs 1 through 5 of the Complaint.

8.     Defendants admit the allegations of paragraphs 6 through 9 of the Complaint.

9.      Defendants admit the allegations of paragraphs 10 through 12 of the Complaint.

10.     Defendants admit the allegations of paragraphs 13 through 14 of the Complaint.

11.     Defendants admit the allegations of paragraph 15 of the Complaint.

12.     Defendants deny the allegations of paragraph 16 of the Complaint.

13.     Defendants deny the allegations of paragraph 17 of the Complaint.

14.     Defendants deny the allegations of paragraph 18 of the Complaint except to admit that Cafesjian had certain assets in addition to his shares in West.

15.     Defendants deny the allegations of paragraph 19 of the Complaint except to admit that GLC hired Waters on August 29, 1996.

16.     Defendants deny the allegations of paragraph 20 of the Complaint.

17.     Defendants deny the allegations of paragraph 21 of the Complaint, except to admit that Mr. Cafesjian, as President and CEO of Cafesjian Enterprises, Inc., signed the Employment Agreement used as Exhibit A, on August 29, 1996.

18.     Defendants deny the allegations of paragraph 22 of the Complaint except to admit that Waters resigned his position with GLC on March 30, 2009.

19.     Defendants admit the allegations of paragraph 23 of the Complaint.

20.     Defendants admit the allegations of paragraph 24 of the Complaint.

21.     Defendants deny the allegations of paragraph 25 of the Complaint except to admit that the Restated Bylaws of the Cafesjian Family Foundation ("Foundation") give Mr. Cafesjian certain authority with respect to the appointment of directors and to admit

that he is a Director and the President (and also the Secretary and Treasurer) of the Foundation.

22.    Defendants deny the allegations of paragraph 26 of the Complaint except to admit that Waters was a Director of the Foundation.

23.    Defendants deny the allegations of paragraph 27 of the Complaint except to admit that GLC paid compensation to Waters, that Mr. Cafesjian made periodic contributions to the Foundation, and that any transfers from the Foundation to GLC were made in compliance with applicable law in light of allocated services and expenses.

24.    Defendants deny the allegations of paragraph 28 except to admit that Waters provided Mr. Cafesjian with research, analysis, strategy, tactics, negotiation, implementation and management of a number of Mr. Cafesjian's ideas and concepts, including work related to the Foundation, work related to The TomKat Limited Partnership, work related to real estate, work related to private equity investments, work related to trusts, work related to investments in the Republic of Armenia, work related to the Cafesjian Museum Foundation, work related to real estate in Washington, D.C., work related to certain investment managers, and certain other services.

25.    Defendants deny the allegations of paragraph 29 of the Complaint, except to admit that Mr. Cafesjian and Waters were in contact from time to time, the frequency of which varied over time, and that the contact was sometimes in person and sometimes by phone, fax or email.

26.    Defendants admit the allegations of paragraph 30 of the Complaint.

27.     Defendants deny the allegations of paragraph 31 of the Complaint, except to admit that, prior to March 30, 2009, Mr. Cafesjian and Waters attended various meetings and gatherings together, with occasional related meals or shopping.

28.     Defendants deny the allegations of paragraph 32 of the Complaint, except to admit that, prior to March 30, 2009, Waters made certain trips within the United States and to the Republic of Armenia, and that some such trips were made for Mr. Cafesjian, the Foundation, or GLC.

29.     Defendants admit the allegations of paragraph 33 of the Complaint.

30.     Defendants lack sufficient knowledge and information to form a belief as to the truth of the allegations of paragraph 34 of the Complaint, since they have to do entirely with subjective impressions on the part of Waters.

31.     Defendants lack sufficient knowledge and information to form a belief as to the truth of the allegations of the first sentence of paragraph 35 of the Complaint, since it has to do entirely with subjective impressions on the part of Waters.  Defendants admit the allegations of the second and third sentences of paragraph 35 of the Complaint.

32.     Defendants lack sufficient knowledge and information to form a belief as to the allegations in the first sentence of paragraph 36 of the Complaint about Mr. Cafesjian's reputation, but admit that Mr. Cafesjian endeavored to act as a thoughtful entrepreneur, to respect his Armenian heritage, the country and its citizens, and to engage in philanthropy.  Defendants deny the allegations of the second sentence of paragraph 36 of the Complaint.

33.     Defendants lack sufficient knowledge and information to form a belief as to the allegations of paragraph 37 of the Complaint insofar as they have to do with the subjective impressions of Waters.  Defendants deny the allegations of paragraph 37 of the Complaint insofar as they pertain to Mr. Cafesjian.

34.     Defendants deny the allegations of paragraphs 38 and 39 of the Complaint.

35.     Defendants lack sufficient knowledge and information to form a belief as to the allegations of paragraph 40 of the Complaint insofar as they have to do with the subjective impressions of Waters.  Defendants admit that Waters resigned from GLC on March 30, 2009.  Defendants deny the allegations of the last sentence of paragraph 40 of the Complaint.

36.     Defendants deny the allegations of the first sentence of paragraph 41 of the Complaint except to admit that Waters received occasional increases to his compensation.  Defendants admit the allegations of the second sentence of paragraph 41 of the Complaint.

37.     Defendants deny the allegations of paragraph 42 of the Complaint except to admit that Waters received increases to his salary and received bonuses during 1996 through 1999, the amounts of which have not been verified from existing records.

38.     Defendants deny the allegations of paragraph 43 of the Complaint except to admit that GLC paid to Waters base compensation and incentive compensation for the stated years, the amounts of which have not been verified from existing records.

39.     Defendants admit the allegations of paragraphs 44, 45 and 46 of the Complaint.

40.     Defendants deny the allegations of paragraph 47 of the Complaint except to admit that FOX sent a letter on or about November 12, 1999, which spoke for itself, with copies of a report.

41.     Defendants deny the allegations of paragraphs 48 and 49 of the Complaint except to admit that the FOX report spoke for itself.

42.     Defendants deny the allegations of paragraph 50 of the Complaint except to admit that Mr. Cafesjian discontinued communications with FOX after reviewing the report.

43.     Defendants deny the allegations of paragraphs 51 and 52 of the Complaint. Indeed, Waters himself testified under oath in April 2009 that his employment contract, which had been signed in 1996, "was never subsequently changed, modified or updated." The only adjustment he mentioned in that testimony was that his salary changed. Waters also testified that "100 percent of my compensation was paid by GLC Enterprises."

44.     Defendants deny the allegations of paragraph 53 of the Complaint.

45.     Defendants deny the allegations of paragraph 54 of the Complaint except to admit that Waters received from GLC the base compensation reported in the middle column entitled "Current Base Comp" for the given years of 2002, 2003 and 2004, and to admit that GLC paid to Waters base compensation for the years of 2000 and 2001, the amounts of which have not been verified from existing records.

46.     Defendants deny the allegations of paragraph 55 of the Complaint except to admit that Waters received from GLC the bonus reported in the middle column entitled

"Current Incentive Comp" for the given year, with the correction that Waters received two payments in 2002, each for $25,000, making a total of $50,000 for that year.

47.     Defendants deny the allegations of paragraph 56 of the Complaint.

48.     Defendants deny the allegations of paragraph 57 of the Complaint except to admit that Waters played a role in the management and supervision of various entities and that his position required some travel.

49.     Defendants deny the allegations of paragraph 58 of the Complaint except to admit the allegations of footnote 2.

50.     Defendants lack sufficient knowledge and information to form a belief as to the trust of the allegations of paragraph 59 of the Complaint.

51.     Defendants deny the allegations of paragraphs 60, 61, 62, 63, 64 and 65 of the Complaint.

52.     Defendants deny the allegations of paragraph 66 of the Complaint except to admit that Waters received from GLC the base compensation reported in the middle column entitled "Current Base Comp" for the given year.

53.     Defendants deny the allegations of paragraph 67 of the Complaint.

54.     Defendants deny the allegations of paragraph 68 of the Complaint except to admit that Waters received from GLC the bonus reported in the middle column entitled "Current Incentive Comp" for the given year, with the correction that there was a bonus of $20,000 for the year 2008.

55.     Defendants deny the allegations of paragraph 69 of the Complaint.

56.     Defendants deny the allegations of paragraph 70 of the Complaint except to admit that Exhibit A speaks for itself.

57.     Defendants deny the allegations of paragraphs 71 through 76 of the Complaint.

58.     Defendants deny the allegations of paragraph 77 of the Complaint except to admit that there was litigation, records of which are in court files, and that Waters was named as a party in that litigation.

59.     Defendants deny the allegations of paragraphs 78, 79 and 80 of the Complaint.  Waters' statement that he was promised a bonus for the AGM&M litigation is flatly contradicted by his testimony in that case.  Waters testified at the AGM&M trial on November 15, 2010 under oath.  Waters was asked, "Are you being paid to be here today?"  Under oath, Waters responded, "No."  Waters went on to explain he was reimbursed for some, but not all, of his expenses related to the lawsuit.

60.     Defendants admit the allegations of paragraph 81 of the Complaint.

61.     Defendants deny the allegations of paragraphs 82, 83 and 84 of the Complaint.

62.     Defendants deny the allegations of paragraphs 85, 86 and 87 of the Complaint.

63.     To the extent that the allegations of paragraph 88 of the Complaint present Waters' interpretation of law, Defendants deny that the allegations are properly stated or applied to facts.  To the extent that the allegations of paragraph 88 of the Complaint present claims of fact, Defendants deny the allegations except to admit that Waters has

been defended against the counterclaims described in paragraph 94 of the Complaint. In fact, Waters testified under oath in 2010 that he has no indemnity agreement with Mr. Cafesjian, and no promise of indemnity.

64. Defendants deny the allegations of paragraph 89 of the Complaint except to admit that Mr. Cafesjian, and Waters as a GLC employee until March 2009, engaged in an effort to develop a museum and memorial to commemorate the victims and survivors of the Armenian Genocide.

65. Defendants admit the allegations of paragraph 90 of the Complaint.

66. Defendants deny the allegations of paragraph 91 of the Complaint, except to admit that Waters assisted Mr. Cafesjian and the Foundation with respect to donations and real estate.

67. Defendants admit the allegations of paragraph 92 of the Complaint.

68. Defendants deny the allegations of paragraph 93 of the Complaint, except to admit that Waters assisted Mr. Cafesjian and the Foundation with respect to the transfer of real estate, that the grant agreement included a reversion clause, and that the reversion clause was important.

69. Defendants admit the allegations of paragraph 94 of the Complaint.

70. To the extent that the allegations of paragraph 95 of the Complaint present Waters' interpretation of law, Defendants deny that the allegations are properly stated or applied to facts. To the extent that the allegations of paragraph 95 of the Complaint present claims of fact, Defendants deny the allegations except to admit that Waters has been defended against the counterclaims described in paragraph 94 of the Complaint.

71.     Defendants lack sufficient knowledge and information to form a belief as to the truth of the allegations of paragraph 96 of the Complaint.

72.     Defendants deny the allegations of paragraph 97 of the Complaint except to admit that Waters has cooperated with and, in some respects, has assisted counsel who has represented Waters, Mr. Cafesjian and the Foundation and to note that Defendants lack sufficient knowledge and information to form a belief as to the truth of the details presented in the allegations of paragraph 97 of the Complaint.  However, in his testimony under oath in 2010, Waters testified that he was not an authorized representative of Mr. Cafesjian and the Cafesjian interests at the trial, that he did not speak on behalf of the Cafesjian interests, and that he appeared at trial as an individual.  In fact, when asked in what capacity he was appearing in court, Waters answered: "I'm a party."

73.     Defendants deny the allegations of paragraphs 98, 99 and 100 of the Complaint.  In fact, as set forth in paragraph 59 of this Answer, Waters testified under oath at trial in 2010 that he was not being paid to be at trial, and that his only compensation was reimbursement for some, but not all, minor expenses.

74.     Defendants deny the allegations of paragraph 101 of the Complaint, except to admit that, during the period prior to Waters' resignation on March 30, 2009, the relationship between Mr. Cafesjian and Waters seemed to Mr. Cafesjian to be mostly positive, that Waters gave the appearance of being trustworthy and that Waters assisted Mr. Cafesjian in a number of activities.

75.     Defendants lack sufficient knowledge and information to form a belief as to the truth of the allegations of the first sentence of paragraph 102 of the Complaint, since

it has to do with subjective conclusions on the part of Waters. Defendants deny the second sentence of paragraph 102 of the Complaint except to admit that Waters assisted Mr. Cafesjian and the Foundation in a number of programs.

76.     Defendants lack sufficient knowledge and information to form a belief as to the truth of the allegations of the first sentence of paragraph 103 of the Complaint, since it has to do with subjective impressions on the part of Waters. Defendants deny the allegations of the second and third sentences of paragraph 103 of the Complaint except to admit that Mr. Cafesjian expected a great deal of himself and his employees and was sometimes concerned about expenses.

77.     Defendants lack sufficient knowledge and information to form a belief as to the truth of the allegations of the paragraph 104 of the Complaint, since it has to do with subjective impressions on the part of Waters.

78.     Defendants lack sufficient knowledge and information to form a belief as to the truth of the allegations of the first sentence of paragraph 105 of the Complaint. Defendants deny the allegations of the second sentence of paragraph 105 of the Complaint except to admit that they perceived Waters as a loyal person during his employment at GLC. Defendants lack sufficient knowledge and information to form a belief as to the truth of the allegations of the third, fourth and fifth sentences of paragraph 105 of the Complaint, since they have to do with subjective claims about state of mind on the part of Waters. Defendants deny the allegations of the last sentence of paragraph 105 of the Complaint.

79.	Defendants lack sufficient knowledge and information to form a belief as to the truth of the allegations of paragraph 106 of the Complaint, since it has to do with subjective impressions on the part of Waters.

80.	Defendants deny the allegations of paragraph 107 of the Complaint, except to admit periodic contacts between Waters and either Mr. Cafesjian or Mr. Cafesjian's representatives.

81.	Defendants deny the allegations of paragraph 108 of the Complaint.

82.	Defendants lack sufficient knowledge and information to form a belief as to the truth of the allegations of paragraph 109 of the Complaint, except to admit that Mr. Cafesjian, GLC or other entities hired various accountants to review certain books and records.

83.	Defendants deny the allegations of paragraph 110 of the Complaint, except to admit periodic contacts between Waters and either Mr. Cafesjian or Mr. Cafesjian's representatives.

84.	Defendants deny the allegations of paragraphs 111 and 112 of the Complaint.

85.	Defendants deny the allegations of paragraph 113 of the Complaint except to admit that in July 2011, Mr. Rick Ostrom, an investigator employed by Waypoint, Inc., contacted Waters, reported his engagement by the law firm of Greene Espel, P.L.L.P., and that he invited a meeting.

86.     Defendants lack sufficient knowledge and information to form a belief as to the truth of the allegations of paragraph 114 of the Complaint, since it has to do with subjective impressions on the part of Waters.

87.     Defendants deny the allegations of paragraphs 115 and 116 of the Complaint, except to admit that Waters conditioned any meeting upon certain requirements.

88.     Defendants lack sufficient knowledge and information to form a belief as to the truth of the allegations of paragraph 117 of the Complaint.

89.     Defendants deny the allegations of paragraphs 118, 119 (the first such, beginning on page 31) and 119 (the second such, found on page 32) of the Complaint.

90.     With respect to the allegations of paragraph 120 of the Complaint, Defendants incorporate the same responses that have been made with respect to paragraphs 1 through 119 of the Complaint.

91.     Defendants deny the allegations of paragraphs 121 through 124 of the Complaint.

92.     With respect to the allegations of paragraph 125 of the Complaint, Defendants incorporate the same responses that have been made with respect to paragraphs 1 through 124 of the Complaint.

93.     Defendants deny the allegations of paragraphs 126 through 129 of the Complaint.

94. With respect to the allegations of paragraph 130 of the Complaint, Defendants incorporate the same responses that have been made with respect to paragraphs 1 through 129 of the Complaint.

95. Defendants deny the allegations of paragraphs 131 through 134 of the Complaint.

96. With respect to the allegations of paragraph 135 of the Complaint, Defendants incorporate the same responses that have been made with respect to paragraphs 1 through 134 of the Complaint.

97. Defendants deny the allegations of paragraphs 136 through 143 of the Complaint.

98. With respect to the allegations of paragraph 144 of the Complaint, Defendants incorporate the same responses that have been made with respect to paragraphs 1 through 143 of the Complaint.

99. Defendants deny the allegations of paragraphs 145 through 152 of the Complaint.

100. With respect to the allegations of paragraph 153 of the Complaint, Defendants incorporate the same responses that have been made with respect to paragraphs 1 through 152 of the Complaint.

101. Defendants deny the allegations of paragraph 154 of the Complaint, except to admit that Mr. Cafesjian, as President and CEO of Cafesjian Enterprises, Inc., signed the Employment Agreement used as Exhibit A, on August 29, 1996.

102. Defendants deny the allegations of paragraphs 155 through 159 of the Complaint.

103. With respect to the allegations of paragraph 160 of the Complaint, Defendants incorporate the same responses that have been made with respect to paragraphs 1 through 159 of the Complaint.

104. Defendants deny the allegations of paragraphs 161 through 164 of the Complaint.

105. With respect to the allegations of paragraph 165 of the Complaint, Defendants incorporate the same responses that have been made with respect to paragraphs 1 through 164 of the Complaint.

106. Defendants deny the allegations of paragraphs 166 through 169 of the Complaint.

107. With respect to the allegations of paragraph 170 of the Complaint, Defendants incorporate the same responses that have been made with respect to paragraphs 1 through 169 of the Complaint.

108. To the extent that the allegations of paragraph 171 of the Complaint present Waters' interpretation of law, Defendants deny that the allegations are properly stated or applied to facts. To the extent that the allegations of paragraph 171 of the Complaint present claims of fact, Defendants deny the allegations except to admit that Waters has been defended against the counterclaims described in paragraph 94 of the Complaint.

109. Defendants deny the allegations of paragraphs 172 through 175 of the Complaint.

110. With respect to the allegations of paragraph 176 of the Complaint, Defendants incorporate the same responses that have been made with respect to paragraphs 1 through 175 of the Complaint.

111. Defendants deny the allegations of paragraphs 177 through 181 of the Complaint.

112. With respect to the allegations of paragraph 182 of the Complaint, Defendants incorporate the same responses that have been made with respect to paragraphs 1 through 181 of the Complaint.

113. Defendants deny the allegations of paragraphs 183 through 187 of the Complaint.

114. Except as otherwise expressly admitted, qualified or denied, Defendants deny each allegation of the Complaint.

**Third Defense**

115. Waters' claims are barred by failure of consideration.

**Fourth Defense**

116. Except for the payment of compensation and bonuses that were paid by GLC, Waters has pointed to no documents that confirm or relate to any deferred compensation, loans, or carry-over of benefits.

117. Waters embezzled funds and has concocted a false story after the fact to account for his embezzlements.

118. Waters' claims are barred by the statute of frauds.

## Fifth Defense

119.    Waters' allegations are invented to cover his embezzlements.

120.    Waters' allegations suggest that he was engaged in tax fraud.

121.    Waters' allegations purport to describe arrangements that are void as against public policy.

122.    Waters' claims are barred by illegality.

## Sixth Defense

123.    Waters was entitled to base compensation, which he was paid.

124.    Waters received discretionary bonuses, which he was paid.

125.    Waters' claims are barred by payment.

## Seventh Defense

126.    Waters breached fiduciary duties to manage funds faithfully, to compile accurate and timely records of all transactions, and to discharge duties for the benefit of his employer.

127.    Waters' allegations of various transactions include an implicit admission that Waters diverted to his own account funds in a manner that is not documented in records that were under Waters' control during his employment.

128.    Waters' claims are barred by unclean hands.

## Eighth Defense

129.    Waters made no timely demands for any of the items that he now alleges to have been owed.

130.    Waters failed to document any arrangements for which he now makes claims, other than for the base compensation and bonuses that he has already been paid.

131.    Waters' claims are barred by waiver.

## Ninth Defense

132.    Waters owed fiduciary duties to his employer.

133.    Waters violated his fiduciary duties by diverting to his own account for his personal benefit funds that belonged to Defendants.

134.    Waters further violated his fiduciary duties by concealing and disguising his embezzlements.

135.    Waters further violated his fiduciary duties by wasting corporate assets and failing to implement in a faithful and honorable manner the projects for which he had responsibility.

136.    Waters' claims are barred by breach of fiduciary duty.

## Tenth Defense

137.    Waters owed contractual duties to his employer.

138.    Waters violated his contractual duties by diverting to his own account for his personal benefit funds that belonged to Defendants.

139.    Waters further violated his contractual duties by concealing and disguising his embezzlements.

140.    Waters further violated his contractual duties by wasting corporate assets and failing to implement in a faithful and honorable manner the projects for which he had responsibility.

141.    Waters' claims are barred by breach of contract.

**Eleventh Defense**

142.    Waters' claims are barred by absence of demand.

**Twelfth Defense**

143.    Waters' claims are barred by his fraud and embezzlements, as set forth more particularity in the Counterclaim, presented below.

## COUNTERCLAIM AND THIRD-PARTY CLAIM

For his counterclaim against Plaintiff/Counterclaim Defendant John J. Waters, Jr. and Third-Party Defendant Cheri Kuhn, Defendant and Third-Party Plaintiff Gerard Leon Cafesjian pleads as follows:

### Facts Relevant to Counterclaim and Third-Party Claim

144.    Mr. Cafesjian retired from West Publishing in 1996 at the age of 71.  Upon his retirement, Mr. Cafesjian decided to dedicate much of his time and his financial support to causes related to his Armenian heritage.  These efforts included both for-profit and not-for-profit enterprises, many of which focused on bringing attention to the Armenian genocide and honoring those who lost their lives during these tragic events.

145.    In an effort to organize his work on Armenian causes, Mr. Cafesjian opened an office in Minneapolis to serve as his family office overseeing his personal, business and philanthropic interests.  Later, Mr. Cafesjian started GLC to be an umbrella organization through which he could manage his interests.

146.    Also in 1996, Waters left West Publishing, and began working for Mr. Cafesjian, assisting him in the management of his personal, business and philanthropic

matters. Mr. Cafesjian grew to trust Waters and gave him significant responsibility overseeing Mr. Cafesjian's interests. Waters accepted these responsibilities and understood that Mr. Cafesjian was placing him in a position of trust. Formally, Waters was employed by GLC, with his duties to include carrying out Mr. Cafesjian's personal, business and philanthropic plans and ideas. All compensation for Waters' work was paid through GLC.

147.    Starting in 1996, and continuing until Waters' departure in 2009, Mr. Cafesjian entrusted many of his personal assets to Waters so that Waters could carry out his duty as Mr. Cafesjian's assistant and trusted aide. Waters accepted this responsibility and, on the surface, appeared to be acting in Mr. Cafesjian's best interest and in accordance with Mr. Cafesjian's personal, business and philanthropic plans and ideas.

148.    At all times, Mr. Cafesjian made clear to Waters that the funds and other assets made available to Waters in carrying out his duties were to be used solely for the benefit of Mr. Cafesjian's personal, business and philanthropic affairs. Mr. Cafesjian never gave Waters permission to spend Mr. Cafesjian's funds for Waters' own personal purposes or for Kuhn's personal purposes.

**A.    Waters' Misused Access to Mr. Cafesjian's Funds for Personal, Business and Philanthropic Purposes.**

149.    Throughout the time period covered by this Verified Complaint, Mr. Cafesjian maintained a personal DDA bank account at Northern Trust Bank of Florida (the "0512 Account"). The funds in this account belonged to Mr. Cafesjian and were to

be used for his personal, business and philanthropic activities. Waters had signing authority on this account.

150. During this time period, Mr. Cafesjian also maintained bank accounts at US Bank in Minneapolis for the same purposes.

151. One such account was an account at US Bank (the "6934 Account") opened on July 6, 1998, with a $20,000 check from the 0512 Account.

152. Waters opened a second such account at US Bank in July 2004 (the "7856 Account.")

153. Waters listed himself and Mr. Cafesjian as signers on the 7856 Account, and listed the address of GLC Enterprises in Minneapolis for the account.

## B. Discovery of Waters' Embezzlement and Fraud.

154. Waters resigned from employment with GLC Enterprises in March 2009. In the summer of 2008, Mr. Cafesjian hired Gary Jones as chief financial officer. Waters trained Mr. Jones on the job.

155. After Waters left GLC Enterprises, Mr. Jones received change of address notification letters from US Bank. One of the notification letters was addressed to Mr. Cafesjian and Waters. Mr. Jones called US Bank and stopped the bank from changing the address on the accounts.

156. The address change was from GLC's address to a business address for several business entities of which Waters is the Manager. Upon information and belief, Waters initiated the change of address that caused US Bank to send the notification letters.

157.   Mr. Jones learned that one of the accounts for which Waters had tried to change addresses was the 7856 Account.  Mr. Jones asked Mr. Cafesjian about the 7856 Account, but Mr. Cafesjian was not aware of that account.  Mr. Jones reviewed the bank account records at the GLC Enterprises offices, and found no records for this account.

158.   Mr. Jones requested bank statements and other records from US Bank for the 7856 Account.

159.   After reviewing the bank statements for the 7856 Account, Mr. Jones became concerned that Waters had engaged in unauthorized withdrawals from the 7856 Account.

## C.   Investigation of Waters' Unauthorized Financial Activity.

160.   In February 2011, Mr. Cafesjian hired counsel, who coordinated an investigation into the activity in the 7856 Account.

161.   Investigators reviewed various financial records including the statements that US Bank provided to Mr. Jones along with general ledgers for Mr. Cafesjian and GLC Enterprises.

162.   This review showed that Waters deposited funds from Mr. Cafesjian's 0512 Account at Northern Trust into the 7856 Account, and then withdrew money from the 7856 Account for his own personal purposes.  The records showed that Waters withdrew a substantial amount of money from the 7856 Account in cash.  Waters also transferred or deposited at least $1,776,500 from the account to accounts that belonged to him or to Kuhn for personal use.  Waters transferred this large sum in small amounts, over a period of time; from approximately 2004 to 2009.   Waters would often make several

withdrawals within a few days, of no more than $10,000, in a pattern that strongly resembled illegal structuring.

163.    Investigators also reviewed the GLC general ledgers and Mr. Cafesjian's personal ledger and saw suspicious coding with respect to the 7856 Account. Waters consistently coded, or directed the coding of, the transactions in Mr. Cafesjian's personal ledger and GLC's ledger as "12/06 purchases," "Cash purchases by GLC," and "Household Unallocated purchases." Many times, the entries would only reflect an account number, a date, and the amount transferred. None of the entries in the general ledger for the 7856 account were for a "loan" or "deferred compensation" to Waters.

164.    Investigators also learned that Waters engaged in this conduct prior to the opening of the 7856 Account. Beginning in 1998 and continuing until he opened the 7856 Account, Waters transferred funds from the 0512 Account at Northern Trust into another US Bank account, the 6934 Account. On information and belief, Waters opened the 6934 Account at US Bank.

165.    Waters utilized these two bank accounts at US Bank to steal Mr. Cafesjian's money for his own personal purposes.

166.    Waters has admitted in his Complaint that he obtained at least $1,807,500 from Mr. Cafesjian. The actual total is higher.

1.    **2004-2009:  Waters Embezzled Funds Using the 7856 Account.**

167.    Waters opened the 7856 Account in July 2004 in name of Gerard L. Cafesjian with a $12,148.40 deposit check transferred from the US Bank 6934 Account.

168.    He had both his name and Mr. Cafesjian's name printed on the checks and gave himself signing authority on the account.

169.    After Waters left GLC Enterprises, Mr. Jones closed the 7856 Account, because it was not used by GLC or other Cafesjian entities.

170.    Waters signed all checks written on this account.

171.    From July 2004 through April 2009, Waters transferred $2,987,148.40 of Mr. Cafesjian's funds into the 7856 Account, and withdrew essentially all of this money for his own personal use.  Almost all of the money Waters transferred into the 7856 Account came from Mr. Cafesjian's Northern Trust 0512 Account.  The remainder came from other of Mr. Cafesjian's funds.

172.    Upon information and belief, from July 2004 through April 2009, Waters withdrew $961,400 of the $2,991,123.39[1]in the 7856 Account by counter withdrawal and by writing checks to "Cash."  Waters not only signed all of the checks from the 7856 Account, but he also endorsed the reverse side of many of the checks that were made out to "Cash."  Waters withdrew cash in amounts below $10,000 on consecutive days in a pattern that appears to be illegal structuring.

173.    From July 2004 through April 2009, Waters withdrew at least $1,012,500 from the 7856 Account and deposited at least $1,012,500 into a US Bank account ending in 0430.  Upon information and belief, this account belongs to Waters personally.

174.    From July 2004 through April 2009, Waters deposited at least $708,000 from the 7856 Account and deposited at least $708,000 into a US Bank account ending in

---

[1] $2,991,123.39 includes $3,974.99 in interest and credits.

9661. Upon information and belief, this account belongs to Cheri Kuhn, Waters' then-girlfriend, now-wife and business partner.

175. From July 2004 through April 2009, Waters deposited at least $31,000 from the 7856 Account and deposited at least $31,000 into a US Bank account ending in 1056. Upon information and belief, this account belongs to Waters personally.

176. From July 2004 through April 2009, Waters deposited at least $20,000 from the 7856 Account and deposited at least $20,000 into a US Bank account ending in 3976. Upon information and belief, this account belongs to Waters personally.

177. From July 2004 through April 2009, Waters deposited at least $5,000 from the 7856 Account and deposited at least $5,000 into a US Bank account ending in 9263. Upon information and belief, this account belongs to Waters and Kuhn.

178. From July 2004 through April 2009, $86,000 of the $2,991,123.39 withdrawal was deposited into other US Bank accounts, including an account ending in 3361. The account holders for this account are unknown at this time.

179. Two checks totaling $40,000 that were coded in GLC Enterprise's general ledger as deposited into the 7856 Account from the 0512 Account at Northern Trust were in fact deposited into a US Bank account ending in 0430, an account that, upon information and belief, belonged to Waters.

180. Waters had no legitimate business purpose for transferring Mr. Cafesjian's funds from the 0512 Account at Northern Trust into the 7856 Account. In addition, Waters had no legitimate business purpose for converting these funds to cash, or for transferring these funds into accounts either he or Kuhn controlled. Mr. Cafesjian did not

authorize Waters to convert any of these funds into cash or deposit the funds into Waters' or Kuhn's personal bank accounts. At all times, Mr. Cafesjian made clear that Waters was to use his funds only for Mr. Cafesjian's personal, business and philanthropic interests.

181. Between July 2004 and his departure from GLC Enterprises, Waters embezzled at least $2,852,900.00 from Mr. Cafesjian using the 7856 Account.

182. Waters fraudulently concealed his illicit transfers and conversion of Mr. Cafesjian's funds into the 7856 Account.

183. Waters' fraudulent concealment of his embezzlement from the 7856 Account tolled any applicable statute of limitations.

**2.    Waters appears to have engaged in illegal structuring.**

184. Under federal law, financial institutions are required to report currency transactions by a customer in an amount of $10,000 or more. 31 U.S.C. § 5313. Individuals seeking to avoid the reporting of currency transactions, often engage in the "structuring" of currency transactions in amounts less than $10,000. Structuring occurs when a defendant conducts or attempts to conduct a transaction with a domestic financial institution with the intent to evade the reporting requirement that the defendant knows exists. Common structuring techniques include engaging in multiple transactions below $10,000 on the same day at different institutions or branches, or engaging in multiple transactions over a course of days below $10,000. Withdrawal of currency in an amount at or below $10,000 for the purpose of evading the reporting of a currency transaction is a crime that can lead to prison time, a criminal fine, or both.

185.   Individuals who engage in structuring are trying to hide their funds from the IRS, law enforcement officials or others.

186.   During the course of his embezzlement of Mr. Cafesjian's funds, Waters repeatedly engaged in what appears to be structuring by withdrawing currency from the 7856 Account in amounts less than $10,000 on successive days.

### 3.   Waters Engaged in Money Laundering.

187.   Waters may have also violated federal laws aimed at money laundering. Federal law prevents individuals from engaging in monetary transactions with funds derived from specified unlawful activity when the transaction is designed to conceal or disguise the source of the proceeds of the unlawful activity.  18 USC § 1956.

188.   Waters would regularly deposit sums between $20,000 and $50,000 from the 0512 Account into the 7856 Account.  He would then withdraw or transfer those funds in a series of smaller transactions, in an apparent effort to conceal or disguise his activity.

### 4.   1998-2004: Waters Embezzled Funds From the 6934 Account.

189.   Upon review of the general ledgers, investigators also saw suspicious deposit patterns with respect to the 6934 Account.  Waters consistently coded, or directed the coding of, the transactions in Mr. Cafesjian's personal ledger and GLC's ledger as "Household Unallocated," "Cash purchases by GLC," and "Various Household Unallocated."  Many times, the entries would only reflect an account number, a date, and the amount transferred.  None of the entries in the general ledger for the 6934 account were for a "loan" or "deferred compensation" to Waters.

190.   In addition to the $20,000 check representing Mr. Cafesjian's funds from the 0512 Account at Northern Trust Bank used to open the 6934 Account, a deposit of $25,000 was made into the 6934 Account in August 1998. A total of $45,000 was deposited into the 6934 Account in 1998.

191.   In 1999, six deposits totaling $180,000 were made to the 6934 Account from Mr. Cafesjian's Northern Trust 0512 account. Deposits of $25,000 were made on April 15, 1999, June 7, 1999, June 8, 1999, and September 15, 1999. A $50,000 deposit was made on October 7, 1999, and a $30,000 deposit was made on December 22, 1999.

192.   In 2000, five deposits totaling $155,000 were made to the 6934 Account from Mr. Cafesjian's Northern Trust 0512 account. Deposits of $25,000 were made on April 24, 2000, June 28, 2000, and October 12, 2000. A $50,000 deposit was made on July 24, 2000, and a $30,000 deposit was made on December 11, 2000.

193.   In 2001, nine deposits totaling $270,000 were made to the 6934 Account from Mr. Cafesjian's Northern Trust 0512 account. Not only did the number of deposits increase in 2001, but the amount of the deposits also increased. A $25,000 deposit was made on June 4, 2001. Deposits of $30,000 were made on February 1, 2001, March 30, 2001, April 30, 2001, June 22, 2001, July 31, 2001, September 4, 2001, October 12, 2001, and December 13, 2001.

194.   In 2002, nine deposits totaling $340,000 were made to the 6934 Account from Mr. Cafesjian's Northern Trust 0512 account. Again, the amount of the deposits increased. Deposits of $30,000 were made on May 10, 2002, June 10, 2002, June 25,

2002, July 16, 2002, September 12, 2002, October 7, 2002, November 7, 2002, and December 20, 2002.  A deposit of $100,000 was made on February 14, 2002.

195.  In 2003, the number and amount of deposits again increased.  Twelve deposits totaling $470,000 were made to the 6934 Account from Mr. Cafesjian's Northern Trust 0512 account.  Deposits of $35,000 were made on January 31, 2003, April 29, 2003, July 1, 2003, August 18, 2003, September 29, 2003, October 29, 2003, December 5, 2003, and December 30, 2003.  Deposits of $30,000 were made on February 21, 2003 and April 3, 2003.  A $100,000 deposit was made on February 14, 2003.

196.  In 2004, six deposits were made totaling $210,000 to the 6934 Account from Mr. Cafesjian's Northern Trust 0512 account.  Each deposit was $35,000.  Deposits were made on February 3, 2004, March 29, 2004, April 27, 2004, May 17, 2004, June 16, 2004, and June 22, 2004.

197.  A $5,000 deposit was made into the 6934 Account in June 2004 from a check written on the Cafesjian Family Foundation, Northern Trust Bank of Florida DDA, account number ending in 2059.

198.  On information and belief, Waters closed the 6934 Account on July 19, 2004.  The bank records for 7856 indicate that the 6934 Account was closed "due to lost information."

199.  On information and belief, during the time period between 1998 and 2004, Waters caused a total of $1,738,624.36 to be deposited into and withdrawn from the 6934 Account.  Of this total, Waters transferred $1,670,000 from Mr. Cafesjian's 0512 Account at Northern Trust Bank.  Waters had no legitimate business purpose for

transferring Mr. Cafesjian's funds from the 0512 Account at Northern Trust into the 6934 Account.

200. On information and belief, Waters embezzled these funds from the 6934 Account. Waters fraudulently concealed his illicit transfer and conversion of Mr. Cafesjian's funds into the 6934 Account.

201. Waters' fraudulent concealment of his embezzlement from the 6934 Account during the time period between 1998 and 2004 tolled any applicable statute of limitations.

## CAUSES OF ACTION

### COUNT I
### CIVIL CONVERSION

### (Against Waters and Kuhn)

202. Mr. Cafesjian restates and realleges all prior paragraphs as if fully alleged herein.

203. Waters improperly solicited and exercised control over Mr. Cafesjian's monies. As Mr. Cafesjian made plain to Waters, Mr. Cafesjian's money was to be used only for Mr. Cafesjian's personal, business and philanthropic interests.

204. Mr. Cafesjian gave Waters access to his financial records so that Waters could use that money for Mr. Cafesjian's personal, business, and foundation expenses in Minnesota. Waters used his access to those records to establish the 6934 Account and then 7856 Account at US Bank in Minnesota.

205. Mr. Cafesjian gave Waters access to his Northern Trust bank account so that Waters could use those funds for Mr. Cafesjian's personal, business, and foundation expenses in Minnesota.

206. Waters instead routed money from Mr. Cafesjian's Northern Trust bank account through the seemingly legitimate 6934 and 7856 accounts to Waters' and Cheri Kuhn's own accounts, for his and Kuhn's own personal use.

207. Waters' and Kuhn's use of Mr. Cafesjian's money from the Northern Trust account destroyed the value of the monies to Mr. Cafesjian, is contrary to Cafesjian's right to such money and intentionally deprives Mr. Cafesjian of possession of that money.

208. Waters' use of monies belonging to Mr. Cafesjian for purposes other than represented and for his own personal gain constitutes civil conversion.

209. Kuhn's use of monies belonging to Mr. Cafesjian for her own personal gain constitutes conversion.

210. As a direct and proximate result of this conversion, Mr. Cafesjian has been damaged in an amount in excess of $75,000 and continues to be damaged thereby.

## COUNT II
## CIVIL THEFT

### (Against Waters and Kuhn)

211. Mr. Cafesjian restates and realleges all prior paragraphs as if fully alleged herein.

212. Waters took Mr. Cafesjian's property when he wrote checks from Mr. Cafesjian's 7856 Account to himself, to Cheri Kuhn, and to "cash." Waters did not have Mr. Cafesjian's permission to write checks from the 7856 Account to his and Kuhn's personal bank accounts. Neither Waters nor Kuhn had Mr. Cafesjian's permission to use any of Mr. Cafesjian's money for Waters' or Kuhn's own personal use.

213. Waters' deposits and withdrawals of money from Mr. Cafesjian's 7856 Account is in violation of Minn. Stat. § 604.14, subd. 1.

214. Kuhn's use of money transferred from Mr. Cafesjian's 7856 Account is in violation of Minn. Stat. § 604.14, subd. 1.

215. Waters is liable to Mr. Cafesjian for 100 percent of the value of the stolen funds that went to his accounts or that Waters took in cash and used for his own personal purposes.

216. Kuhn is liable to Mr. Cafesjian for 100 percent of the value of the stolen funds that went to her accounts or that Kuhn took in cash and used for her own personal purposes.

217. As a direct and proximate result of this civil theft, Mr. Cafesjian has been damaged in an amount in excess of $75,000 and continues to be damaged thereby.

### COUNT III
### BREACH OF FIDUCIARY DUTY

**(Against Waters)**

218. As vice president of GLC Enterprises and other Mr. Cafesjian-related entities, Waters had significant access to Mr. Cafesjian's finances and financial records.

As Mr. Cafesjian's employee, Waters had a fiduciary relationship to Mr. Cafesjian and a duty to act in Mr. Cafesjian's interests. Waters further occupied a fiduciary relationship as an officer or director of GLC Enterprises and The Cafesjian Family Foundation to those corporations. Mr. Cafesjian placed a high level of trust and confidence in Waters to use his finances and financial records only to advance Mr. Cafesjian's personal, business and philanthropic interests, and not for Waters' own personal gain. Waters accepted this position of trust and confidence.

219.   Because Waters had a fiduciary relationship to Mr. Cafesjian, GLC Enterprises and The Cafesjian Family Foundation, he owed Defendants a fiduciary duty to act in accord with Mr. Cafesjian's interest and stated instructions to use Mr. Cafesjian's money only for Mr. Cafesjian's personal, business, or philanthropic interest.

220.   Waters had a duty to not act as an adversary to Mr. Cafesjian.

221.   Waters embezzled money from Mr. Cafesjian's Northern Trust bank account into Waters' own personal bank accounts for his own personal use.

222.   Based on the foregoing conduct, Waters willfully breached and continues to breach the fiduciary duty he owed to Defendants.

223.   As a direct and proximate result of Waters' breach of the fiduciary duty he owed to Defendants, Defendants have been damaged in an amount in excess of $75,000 and continues to be damaged thereby.

## COUNT IV
## CONSTRUCTIVE TRUST

### (Against Waters)

224.    Mr. Cafesjian restates and realleges all prior paragraphs as if fully alleged herein.

225.    Waters had a fiduciary relation to Mr. Cafesjian as Mr. Cafesjian's employee.

226.    Waters had a fiduciary relation to GLC Enterprises as a Director and Vice President.

227.    Waters had a fiduciary relation to The Cafesjian Family Foundation as a Director and Secretary/Treasurer.

228.    Waters abused the confidence and trust that Mr. Cafesjian bestowed upon him by depositing money from Cafesjian's Northern Trust account into the 7856 Account and then transferring money from those seemingly legitimate accounts into Waters' personal accounts and accounts owned by Kuhn.

229.    Waters' transfer of funds from Mr. Cafesjian's 0512 account at Northern Trust through the 7856 Account to Waters' personal accounts resulted in an adverse action and inequitable withholding of money that belonged to Mr. Cafesjian. Waters' unjust enrichment would result if he is allowed to retain these ill-gotten gains.

230.    Waters' abuse of Mr. Cafesjian's trust and confidence caused Mr. Cafesjian harm. As a result of Waters' duplicitous conduct and illicit activity, Mr. Cafesjian has been damaged in an amount in excess of $75,000 and continues to be damaged thereby.

## COUNT V
## FRAUD AND MISREPRESENTATION

### (Against Waters)

231.     Mr. Cafesjian restates and realleges all prior paragraphs as if fully alleged herein.

232.     Waters engaged in conduct and made false representations or omissions to Mr. Cafesjian that induced Mr. Cafesjian to give Waters unlimited access to Mr. Cafesjian's finances and/or induced him to continue giving Waters unrestricted access. These representations and omissions include, but are not limited to:

    a.    Failing to disclose that Waters was depositing money from Mr. Cafesjian's Northern Trust bank account 0512 into the 6934 US Bank account;

    b.    Failing to disclose that Waters was depositing money from Mr. Cafesjian's Northern Trust bank account 0512 into the 7856 US Bank account;

    c.    Failing to disclose that Waters was withdrawing money from US Bank account 7856 to Waters' own personal accounts; and

    d.    Failing to disclose Waters was also writing checks to Cheri Kuhn from the 7856 account.

233.     Each of these omissions dealt with past or present facts, was material, and was susceptible of knowledge.

234.   Waters knew these omissions to be false at the time they were made or remained silent when he had a duty to speak.

235.   Waters made such omissions knowing that Mr. Cafesjian would reasonably rely on his misrepresentations and omissions and Waters fully intended that Mr. Cafesjian do so.

236.   Reasonably relying on such omissions, Mr. Cafesjian was induced to continue providing Waters with access to Mr. Cafesjian's finances.

237.   As a direct and proximate result of Waters' fraud and misrepresentations, Mr. Cafesjian has been damaged in an amount in excess of $75,000 and continues to be damaged thereby.

## PRAYER FOR RELIEF

WHEREFORE, Gerard L. Cafesjian prays for judgment, in his favor, and against John J. Waters, Jr., and Cheri Kuhn Waters, a/k/a Cheri Ann Kuhn, as follows:

1. Dismissing Plaintiff Waters' Complaint with prejudice.

2. Awarding Mr. Cafesjian damages in an amount in excess of $75,000 yet to be determined, equal to the damages suffered as a result of the unlawful conduct, practices, and activities engaged in by Waters, plus any and all penalties and/or exemplary damages permitted by law.

3. Awarding Mr. Cafesjian interest, costs and disbursements.

4. Granting such other, further, or different relief as this Court deems just and equitable.

Dated:  April 9, 2012

**GREENE ESPEL P.L.L.P.**


By    s/ Erin Sindberg Porter
Larry D. Espel, Reg. No. 27595
Andrew M. Luger, Reg. No. 189261
Erin Sindberg Porter, Reg. No. 388345
200 S. Sixth Street, Suite 1200
Minneapolis, MN  55402
(612) 373-0830

*Attorneys for Defendants Gerard Leon*
*Cafesjian, The Cafesjian Family*
*Foundation, and G.L.C. Enterprises, Inc.*